Filed 12/14/23  P. v. Nichols CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERIC LAVELLE NICHOLS,<br><br>    Defendant and Appellant. | F083958<br><br>(Super. Ct. No. BF182068A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

On August 24, 2021, a jury convicted defendant Eric Lavelle Nichols of the first degree murders of Paul Dean and Jerome Davis (Pen. Code, §§ 187, subd. (a), 189,

counts 1 & 2),[1] and found true all enhancements and allegations.[2] Subsequently, defendant was sentenced to two indeterminate terms of life without the possibility of parole, plus 25 years to life.  Further, defendant was sentenced to a total aggregate determinate term of 53 years 8 months.

On appeal, defendant makes several claims of alleged errors by the trial court. Specifically, defendant contends the trial court erred when it:  (1) denied trial counsel's two *Batson*/*Wheeler*[3] motions; (2) improperly admitted ShotSpotter evidence under *Kelly*,[4] and the expert (Paul Greene) lacked the necessary qualifications to testify regarding the ShotSpotter technology; (3) failed to hold a *Marsden*[5] hearing and protect his Sixth Amendment right to effective counsel; (4) failed to inquire as to the reasons behind several jurors laughing during his cross-examination, which violated his rights to a fair trial under the Sixth and Fourteenth Amendments to the federal Constitution; and (5) improperly allowed the prosecutor to impeach him with portions of his self-published book, *Loc Tales: The True Story of a California Gangsta*.

We conclude, that as to each individual claim, the trial court did not err. Accordingly, we affirm the judgment.

---

[1]   All further references are to the Penal Code, unless otherwise stated.

[2]   As we discuss further below, defendant was also convicted and sentenced to additional offenses and enhancements.

[3]   *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[4]   "Formerly known as the *Kelly-Frye* rule, based on the rulings of *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013 [(*Frye*)], the rule is now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*."  (*People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8 (*Nieves*), citing to *People v. Bolden* (2002) 29 Cal.4th 515, 545.)  Although both parties characterize this argument as arising under *Kelly*/*Frye*, we will refer to this as the *Kelly* rule.

[5]   *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

STATEMENT OF CASE

On May 6, 2021, the Kern County District Attorney filed a first amended information charging defendant with two counts of premeditated first degree murder (§§ 187, subd. (a), 189, count 1 (Paul) & count 2 (Jerome)), with the multiple murder special circumstance (§ 190.2, subd. (a)(3)) and the enhancement he personally and intentionally discharged a firearm which proximately caused great bodily injury or death (§ 12022.53, subd. (d)); carjacking (§ 215, subd. (a), count 3), with the enhancement he personally used a firearm during the commission of the offense (§ 12022.53, subd. (b)); robbery (§ 212.5, subd. (c), count 4), with the enhancement he personally used a firearm during the commission of the offense (§ 12022.53. subd. (b)); carjacking (§ 215, subd. (a), count 5); felon in possession of a firearm (§ 29800, subd. (a)(1), count 6); and robbery (§ 212.5, subd. (c), count 7), with the enhancement he personally used a firearm during the commission of the offense (§ 12022.53, subd. (b)).[6] As to all offenses, the information alleged a prior strike offense for assault with a firearm (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d), 245, subd. (a)(2)) and a prior serious felony offense (§ 667, subd. (a)).

On August 24, 2021, a jury convicted defendant on all counts and found true all enhancements and allegations. As to the alleged prior strike and serious felony offense, the trial court in a bifurcated trial found true that defendant suffered a prior conviction for a violation of section 245, subdivision (a)(2), as alleged in the information.

Subsequently, the trial court sentenced defendant as follows:

● As to count 1, an indeterminate term of life without the possibility of parole, plus consecutive terms of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and five years for the prior serious felony offense (§ 667, subd. (a)).

---

[6] Prior to the jury trial, the People dismissed count 5 (§ 215, subd. (a)) in the furtherance of justice.

● As to count 2, the trial court sentenced defendant to an indeterminate term of life without the possibility of parole, plus consecutive terms of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and five years for the prior serious felony offense (§ 667, subd. (a)), to be served consecutive to count 1.

● As to count 3, the trial court sentenced defendant to the upper term of nine years, doubled to 18 years because of the prior strike, plus consecutive terms of 10 years for the firearm enhancement (§ 12022.53, subd. (b)), and five years for the prior serious felony offense (§ 667, subd. (a)), to run consecutive to count 2.

● As to count 4, the trial court sentenced defendant to a term of two years, plus a consecutive term of three years four months, which is one-third the middle term of 10 years for the firearm enhancement (§ 12022.53, subd. (b)), to be served consecutive to count 3.

● As to count 6, the trial court sentenced defendant to the upper term of three years, doubled to six years because of the prior strike, but stayed the sentence pursuant to section 654.

● As to count 7, the trial court sentenced defendant to a term of two years, plus a consecutive term of three years four months, which is one-third the middle term of 10 years for the firearm enhancement (§ 12022.53, subd. (b)), to be served consecutive to count 4.

The total aggregate indeterminate terms imposed are life without the possibility of parole, plus 25 years to life, and life without the possibility of parole, plus 25 years to life. The total aggregate determinate term imposed is 53 years 8 months.

## SUMMARY OF FACTS

### I. The August 2, 2020 Robbery (Count 7)

On August 2, 2020, Carolina R. worked at a furniture and appliance store in Bakersfield when defendant walked by the store. Defendant stopped at the front of the store, looked inside, and said, " 'Oh, is this some sort of auction house?' " Carolina told

4.

him no and defendant walked away. Approximately 20 seconds later, defendant returned and "ha[d] a mask[7] on and he ha[d] something in his hand," which Carolina later determined to be a jug of gasoline.[8] Carolina responded, "Is that a gallon of something?" and defendant told her twice, " 'This is gasoline. I'm going to pour it over you and I'm going to set you on fire if you don't do what I say. Give me the money.' " Carolina tried to stay calm and stated, "Okay, I'll show you where the money is. You can have the money. It's fine."

Carolina went to the back office and attempted to grab the money when defendant "grab[bed] [her] arm with one hand and he start[ed] pouring the liquid … gasoline." Defendant then "end[ed] up dropping the whole gallon on the floor and then he pull[ed] out a [black] gun," pointed the gun at Carolina's head and said, " 'Give me the money.' " Carolina handed over between $300 to $800 to defendant and he stuffed the money in his pocket. Defendant then "point[ed] the gun now to the front of [Carolina's] face and he sa[id], 'Close your eyes.' " At this point, defendant left the store. Carolina testified this incident "was easily the scariest thing that's ever happened to [her]."

## II.     The Events of August 4, 2020

In the morning of August 4, 2020, defendant and his girlfriend, Valerie A., drove over to Paul's home to pick up a black handgun with black tape on its grip. Valerie was familiar with the handgun and had "seen the gun plenty of times before so [she] kn[e]w it." Defendant grabbed the handgun from Paul and placed the gun in his waistband. Valerie then went to work at noon after spending the morning with defendant.

---

[7]     Carolina described the mask as "one of the masks from [the movie] The Purge, where it's pretty much like a very eer[ie] smiled face, like, that curves all the way upwards."

[8]     Criminalist Jeehak Kim testified he analyzed the DNA from the jug and concluded, "the two profiles [one of which was defendant] were a match" and "the random match probability was one in 7.8 nonillion."

5.

## A. The Carjacking (Counts 3 & 4)

On that same day, at or around 7:00 p.m., Henderson P. drove his gray 2010 Dodge Grand Caravan with a North Dakota license plate to a gas station in Bakersfield. While at the gas station, defendant approached Henderson with a large gray storage bin and repeatedly asked him for a ride.[9] Henderson eventually agreed to give defendant a ride and defendant proceeded to sit in the front passenger seat. During the drive, defendant talked with a female on the phone and Henderson heard her refer to defendant as "Big E." Defendant then changed into a "jersey-type shirt" and "put some kind of chain or something, medallion or something, around his neck."

Later on, Henderson drove to a cul-de-sac and stopped the vehicle. Henderson "exit[ed] the van, went around to the passenger's side, took out [defendant's] [bin], and set it down on the ground and closed the van door and went back around to [the driver's] side to get in to take off." Defendant then "opened the side of the van door and put his stuff back in." Henderson asked defendant, "What are you doing?" and defendant then put a black handgun to Henderson's head and told him, " 'Back away from the van. I don't wanna have to scatter your brain.' " Henderson replied, "Man, you don't know what you're doing" and defendant responded, " 'I don't wanna have to kill you. Back away from the van.' " Defendant said, " 'Empty your pockets' " and he then grabbed Henderson's money and cell phone and drove away. Henderson testified he did not give defendant permission to use the van and that the whole incident left him "terrified."

Subsequently, Henderson ran over to an individual, Adam M., who was packing boxes inside his garage. Henderson "seemed scared … [and] came in saying someone robbed his car, took a car, and he need[ed] to call—and he wanted [Adam] to call the cops." Specifically, Adam testified that Henderson told him "[h]e had taken his car, like pulled a gun on him and took his car, forced him out of his own car." Henderson

---

[9] Henderson testified defendant was wearing a Farmers Insurance Group shirt with either "Eric L. Nichols or Eric Nichols" on the front. He also identified defendant in court and testified he had never seen him before this incident.

described the car to Adam as a "van." Henderson used Adam's phone to call 911 and eventually law enforcement arrived on scene. Adam then observed an African-American male drive a van by his house.

### B. The Murders (Counts 1, 2 & 6)

Later on that same evening, defendant picked Paul up in the van and drove over to a motel. While at the motel, defendant ran into Jerome and the three of them ended up hanging out. At 10:39 p.m., Paul's girlfriend, Lakeisha E., called Paul on the phone and heard defendant "yelling something in the back" and he "sound[ed] hostile."

At or around 10:45 p.m., the van stopped near the intersection of 10th Street and M Street, near where James E. worked on his car. James observed an individual step out of the van and walk slowly "and then there was another person behind them, and they walked almost to the intersection." Thereafter, "[t]he person who had had on like a white T-shirt, a light-colored T-shirt, and his hand came up and [James] [saw] … [a] yellow flash." James heard a pop and "[t]he person in front fell down, and, like, his chest hit the ground first, then his head, and then his legs came up behind his back." The shooter then "kicked the man with the foot, and then that was when he reached down and he started patting the man down." The man on the ground, who was later identified as Paul, was shot in the head and died on scene.

The shooter then walked over to the right passenger's side of the van and "fired another shot." James observed the muzzle flash and heard a pop from the second shot. The shooter then got back into the van and drove off.[10] James identified the shooter as a black male with a "pot belly." The victim, later identified as Jerome, was shot in the forehead at close range and was subsequently transported to the hospital where he later died.[11]

---

[10]　　The van was captured by several surveillance cameras and was also observed by an officer responding to the murder scene.

[11]　　An autopsy was conducted on both Paul and Jerome. Forensic Pathologist E. Carpenter testified the causes of death were gunshot wounds to the head.

7.

## III.    Defendant's Conduct After the Murders

At or around 11:15 p.m., defendant returned to the motel and looked for a ride. Subsequently, Audrey L. and Marquell H. picked up defendant and drove him to Brandon W.'s house.  Defendant and Brandon drove around to several ATMs to withdraw money, but were unsuccessful.[12]

The next day, defendant returned to the motel wearing a straw hat and pushing a walker.  Defendant became involved in a fight and brandished a black handgun at the occupants in room 14.  A motel employee ended up telling defendant to leave.

Defendant then called Valerie to pick him up from the motel.  Valerie picked up defendant and he loaded a straw hat and walker into her car.[13]  Defendant then had her drive around town looking for a lost wallet.  During this time, Valerie observed defendant with the same handgun he had before in his waistband.[14]  Subsequently, they parked the car by an apartment complex in the Stockdale area.  The next morning on August 6, 2020, defendant and Valerie rented a room at a Wasco motel.

## IV.    The Law Enforcement Investigation

On August 4, 2020, the Bakersfield Police Department received two ShotSpotter, Incorporated (ShotSpotter)[15] notifications that two gunshots had been fired near the 10th Street and M Street intersection at 10:48 p.m. and 10:49 p.m.  Officers responded to the scene and en route Officer J. Otterness noticed a silver Dodge Caravan with a flat tire leaving the area of the shootings.  Officer Otterness believed the van may have been struck by gunfire.

---

[12]    ATM security footage captured defendant wearing a grey jersey.

[13]    A straw hat and walker were later found inside Valerie's car.

[14]    It was stipulated by both parties that defendant was a convicted felon and was therefore prohibited from possessing a firearm.

[15]    As we discuss in further detail below, ShotSpotter "is an acoustic gunshot detection and location system" that utilizes "a number of microphone sensors" that "listen specifically for impulsive noises … specifically, the sounds of gunfire."

Officers arrived at the intersection and noticed two individuals, Paul and Jerome, lying in the roadway. Both Paul and Jerome had gunshot wounds to their heads. Officers searched the area and located blood in the area between Paul and Jerome's body, and a spent nine-millimeter bullet casing near Paul's body. Officers then obtained surveillance footage from several establishments and the silver van was seen traveling in the same area as the murders. Officers located the van at the motel and seized it.

Later on, officers searched the van and noticed the front passenger tire was mostly flat, and a substantial amount of blood[16] and a spent nine-millimeter bullet casing were inside the van. Defendant's fingerprint was also found on the van's driver's side door.

Subsequently, law enforcement obtained a warrant for "pings"[17] associated with defendant's cell phone. It was determined the cell phone pinged in the area of the Wasco motel where defendant and Valerie were staying. Officers located defendant at the motel where he was arrested and his cell phone was seized.[18] Later on, defendant was interviewed and denied being involved in the murders.[19] However, defendant did admit to having the nickname of "Big E-Loc" and told officers, "You don't talk to me like that, man, I'm Big E-Loc, man."

Officers also contacted Valerie who directed officers to an apartment complex where defendant had exited the car to relieve himself. Officers searched the area, noticed a stone paver out of place, and located a black handgun[20] with black tape on the handle

---

[16] The blood was swabbed for DNA, and it was determined to be Jerome's DNA to a high probability.

[17] A cell phone ping "giv[es] a real-time location within varying radiuses where that cell phone is" located.

[18] A video was found on defendant's cell phone which showed defendant holding a black handgun with a black taped handle.

[19] Defendant also testified on direct examination he had no involvement in the murders and that another shooter was responsible for the killings, however, he did acknowledge being present with Paul and Jerome at the time of the murders.

[20] DNA samples obtained from the handgun matched defendant's DNA to a high probability. Specifically, Criminalist J. Garza testified it is "[o]ne hundred and eighty

underneath the paver.  Valerie identified this firearm as the same firearm she observed defendant with the day before.  Valerie also testified defendant called her from jail and pressured her to not come to court "[t]hree to four times."

Criminalist A. Brown examined the two spent nine-millimeter bullet casings obtained from the murder scene, along with the handgun collected from the apartment complex.  The bullet casings' markings revealed they were fired from the seized handgun.

Further, Kern County District Attorney Investigator evaluated the tower usage data from defendant's cell phone and determined the cell phone was in the area where Henderson had called 911 after being carjacked.  Defendant's cell phone was also used at the time and area where Paul and Jerome had been shot.

## ARGUMENT

### I.  The Trial Court Did Not Err in Denying Trial Counsel's Two Separate *Batson*/*Wheeler* Motions

Defendant contends the trial court erred in denying trial counsel's two *Batson*/*Wheeler* motions because the prosecutor used her peremptory challenges in a discriminatory manner by striking all the African-American woman from the jury.  We disagree.

#### A.  Additional Factual Background

The trial court began the jury selection process on June 29, 2021, when it swore in the first panel of prospective jurors.  Because of the COVID-19[21] pandemic, the trial

---

billion times more likely" to be defendant's DNA than a random African-American individual.

[21]    The formal name of the COVID-19 virus is the "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)."  (World Health Organization, *Naming the coronavirus disease* (*COVID-19*) *and the virus that causes it*, <https://www.who.it/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it> [as of December 11, 2023].)  In this opinion, we will refer to the virus as COVID-19.

court utilized questionnaires "to aid and assist … in the jury selection process" and it received 108 questionnaires from prospective jurors.[22]  After the trial court's hardship and for cause excusals,[23] along with juror nonappearances, 82 prospective jurors remained.  Of the 82 remaining prospective jurors, four were African-American females (4.9 percent of the panel).[24]

After the prosecutor's eighth peremptory challenge, trial counsel made a *Batson/Wheeler* motion.  Trial counsel alleged the prosecutor excused Juror No. 5660560 (Juror 5660560) and Juror No. 5733944 (Juror 5733944) based on race.  Specifically, trial counsel argued:

> "This is a prosecution where the defendant's black.  All the major players are black.  And I would request that the Court inquire of counsel for the prosecution the basis of the exclusion of those two women to make sure that it was not done on racial lines alone."

The trial court subsequently found "that the prima facie case ha[d] been shown by the defense" and asked that the prosecutor "explain to the Court reasons why [she] excused [Juror 5660560] and [Juror 5733944]."  The prosecutor responded as follows:

> "With respect to [Juror 5660560], I excused her given, essentially, her employment and her previous employment.
>
> "Her employment is a program specialist or case manager for approximately a year and a half.  While it is within the probation department, which is technically a law enforcement agency, she has one-on-one counseling with adult probationers and, essentially, is their, quote unquote, life coach.

---

[22]    All juror information referenced in this opinion is based on these questionnaires and jurors' answers during voir dire.

[23]    Two of the excused jurors (Juror No. 5841524 (Juror 5841524) and Juror No. 5882195 (Juror 5882195)) both identified themselves as African-American females. Juror 5841524 was excused for hardship because she was in quarantine due to exposure to COVID-19 and Juror 5882195 was excused for cause.

[24]    Juror No. 5765025, who also identified herself as an African-American female, was never called to the panel.

11.

"She previously worked as a social worker for eight and a half years, and in my experience of doing this for approximately 13 years, I tend to believe social workers and counselors, especially those that work with convicted criminals, tend to be more sympathetic towards criminal defendants.

"She also included that at times the criminal justice system is not fair.

"But my main reason for kicking her was the employment.

"I would add for the record, I did kick [Juror No. 5789003 (Juror 5789003)], who while she's not a social worker or life coach, she does have regular contact with inmates at, I believe she said, Wasco State Prison, and so that is another reason under the comparative analysis that I used a challenge. [¶] … [¶]

"… As to [Juror 5733944], the main reason I kicked [Juror 5733944] is her age. She's only 22 years old.

"Again, for the record, I did believe she was Hispanic. That's what is circled. But African-American is also circled on her questionnaire.

"Her youth and inexperience is something that I take heavily into account, and she has only been working for approximately—she wrote zero years at occupation on the questionnaire, but I recall it was either one month or three months during her questioning by me. I don't attribute that to anything of significance to yield her significant life experience that other jurors possess to sit on a homicide case.

"I also considered the fact that she wanted to start a podcast, a crime podcast, she mentioned, I think, with one of her friends, and typically, in my experience, anyone in the news-reporting-type business is more liberal rather than conservative in sort of questioning what police did, the thoroughness of police work, things of that nature, things that could be done to help. And so I think it's asking too many questions.

"For comparative analysis, I did also kick [Juror No. 5850745 (Juror 5850745)], who is involved in the news industry as well—he was a white male—for those same reasons."

The trial court subsequently denied trial counsel's *Batson*/*Wheeler* motion. Specifically, the trial court stated the following:

12.

"In considering the reasons for kicking specifically [Juror 5660560] and [Juror 5733944], the Court at this time finds that the reasons given for challenging those two individuals are group neutral. Specifically, appellate courts have recognized a valid reason in excusing individuals for employment stereotypes, as well as youth reasons or prospective jurors being young.

"The Court has appreciated the comparative analysis conducted by [the prosecutor] in explaining that those reasons have been relied on by her to release individuals other than or in addition to the two prospective jurors that have been challenged.

"From the totality of the circumstances, I find that the moving party has failed to establish, by a preponderance of evidence, that the proffered explanations are genuine and not a sham, and on that basis, I will find that group bias has not been proved."

Later on, after the prosecutor's 12th peremptory challenge, trial counsel made a second *Batson*/*Wheeler* motion. Trial counsel alleged the prosecutor excused Juror No. 5747794 (Juror 5747794) based on race. Specifically, trial counsel stated the following:

"Counsel's last challenge of the latest juror, number four, [Juror 5747794] was African-American.

"When this issue came up a few minutes ago, [the prosecutor] had dismissed two out of the three African-American jurors in this portion of the panel, in this 45.

"With the dismissal of [Juror 5747794], she's now excused a hundred percent of the African-American—potential African-American— African-American potential jurors in this group, and it just appears, despite counsel's protestation to the opposite, this is a systematic dismissal of all the African-Americans available for jury service in this matter."

The trial court then found defendant made a prima facie showing of discrimination and provided the prosecutor an opportunity to explain the challenge. The prosecutor responded as follows:

"I excused [Juror 5747794] for a few reasons.

"One, she works at Wasco and she is an alcohol and drug counselor. Again, she deals on a daily basis with convicted criminals, convicted felons.

13.

"For similar reasons as I said to [Juror 5660560] earlier, I think that people, male, female, no matter what color your skin is, who work on a daily basis with assisting convicted felons, they tend to be more sympathetic towards those charged with crimes.

"And prior to that she did that again with people with mental—I think she said a mental facility, and she would teach alcohol and behavioral classes in her previous employment, which was her—she said the current employment five years. I believe she said ten years at the previous employment.

"I anticipate in this case perhaps substance abuse coming to light given the [Evidence Code section] 402 hearing with the allegations that the defendant was high on PCP, and I think someone who has worked for approximately 15 years treating people with mental or alcohol or otherwise substance abuse related problems might yield her more sympathetic to the defendant.

"Additionally, she talked about her husband being a gang—he was in a gang prior to the two of them getting together. That was written in her questionnaire.

"And she also said that people who are in street gangs are looking for a support group with requesting—or excuse me—on the question about do you have a strong opinion about criminal street gangs.

"Again, I think that is an answer that we haven't seen amongst anyone in the entire group. Typically this question is either marked N/A or it is marked they have strong opinions that gangs are horrible and violent, and not one time has anyone said it's to provide youth with support or a support system.

"So that, coupled with her employment, I feel would yield her sympathetic towards this defendant in this type of case.

"I would say for the record, as well, that I had similar reasonings for kicking [Juror No. 5914024 (Juror 5914024)], who was a Hispanic female. She mentioned that her husband was accused, and even though she felt that she could be fair, I think that her experience with him and the court system provides a similar comparative analysis.

"She also was a social worker for five years prior to her current employment as a health benefit advisor at Kern Medical, where she's been for eight months; so the social worker employment again came into play and I think can be used for the comparative analysis.

14.

Trial counsel then provided the following additional argument in support of his

*Batson*/*Wheeler* motion:

> "I think in a *Batson-Wheeler* context, any experienced prosecutor—and I want to preface this by I'm not impugning [the prosecutor's] integrity or veracity.
>
> "I think any experienced prosecutor can find a way to justify the exercises of peremptory challenges for a protected group such as, in this case, African-Americans.
>
> "The question is—and obviously the reason that the *Batson-Wheeler* line of cases exist is because there has been historically the systemic exclusion of minorities from juries in which the defendant happens to be a member of the minority, the same minority as that being excluded by the prosecution, and I would suggest that the fact we have now 100 percent of this 45-juror panel, 100 percent of that minority group, excused by the prosecution, notwithstanding [the prosecutor's] explanations as to her choice of peremptories, is going to deprive my client of a fair trial, a jury by his peers, because a jury by the peers includes African-Americans and the cross-section. I think there's a compelling interest to be inclusive of those groups when possible.
>
> "Obviously if you had [Juror 5747794] or the other two women who were excluded and they had put on their questionnaires or stated in open court that yes, my husband's a gangbanger and I don't see anything wrong with it or I think African-American men are wrongfully persecuted by the system, something of that nature that would indicate that they had a political agenda or social agenda to put forward, then, yes, I think even if it were all three, exclusion of all three under such circumstances would be tough to battle with.
>
> "But we have pretty innocuous reasons for these three ladies' exclusion by [the prosecutor], which have nothing to do with—well, that pretend to have nothing to do with race, but when you look at her answers, those answers could—if the women weren't black and they happened to be white, I don't think they would have been excused. There's nothing in the answers that they gave that was of any significance.
>
> "And I understand these are peremptory challenges, but *Batson-Wheeler* exists for a reason, and this is precisely the reason." (Italics added.)

15.

The trial court denied the second *Batson*/*Wheeler* motion. Specifically, the trial court stated the following:

> "Counsel, the record should reflect that all of these jurors filled out a juror questionnaire, which has been part of the record. This is material that counsel has possessed and has reviewed prior to the examination process. And because they are part of the record, they contain material that can be utilized and considered by counsel.

> "I trust, based on that examination that both counsel did with this initial panel, that they have reviewed the questionnaires extensively, and, based on that review, even discerned whether they had questions for particular individuals or whether they needed to inquire further based on oral responses or responses contained within the questionnaires they returned.

> "The Court makes the note because there were references [the prosecutor] made in justifying her peremptory challenge in releasing [Juror 5747794] from the panel, specifically reference to particular responses regarding her husband being killed by another gang member and open-mindedness and so forth, in addition to people who attend a street gang are looking for some type of support that they've never had, et cetera. That is significant because it does involve a reason that [the prosecutor] has provided on the record.

> "Additionally, and arguably more importantly for the Court's purposes, the Court has considered the other reason involving employment stereotypes and so forth and the comparison analysis presented by [the prosecutor].

> "[Trial counsel], I would agree with you that if an African-American individual was released and there was one comment used as justification to release that person, but when reviewing the venire in its entirety through a comparative analysis other individuals remained on the panel that were substantially similarly situated to the person released, there would call into question a serious concern regarding the justified reasoning in exercising a peremptory challenge.

> "In this particular case, [the prosecutor] has even conducted a comparative analysis herself as it relates to exercising peremptory challenges to release individuals who are similarly situated to the three individuals in question, including [Juror 5747794], the last person that has now become the subject of a *Batson-Wheeler* motion.

16.

"In considering the comments made by [the prosecutor], the Court does find that the reasons given for challenging [Juror 5747794] are group neutral.

"I find, from the totality of the circumstances, that the moving party has at this time failed to establish by a preponderance of the evidence, that the proffered explanations are genuine and not a sham, and, on that basis, I find that group bias has not been proved." (Italics added.)

Below we describe in more depth the circumstances surrounding the prosecutor's three peremptory challenges of the African-American women who were the subject of trial counsel's two *Batson*/*Wheeler* motions.

### 1. *Prospective Juror 5660560*

Juror 5660560 was a married 43-year-old African-American woman with seven adult children. She was college educated and worked at the Kern County Probation Department with adult probationers as a program specialist, which aimed to "[a]ssist [her] participants to promote change of their thinking process … to reduce recidivism."

In her questionnaire, Juror 5660560 stated, "at times the [criminal justice] system is fair and at times [she] feel[s] the system has been unfair." Specifically, she told the prosecutor, "The reason I say that is because I feel like—well, not I feel. I know [two] people that have been in situations where I think they were just prejudged and weren't given a fair opportunity, where people just automatically assumed things."

### 2. *Prospective Juror 5733944*

Juror 5733944 was a 22-year-old African-American/Hispanic woman, and she lived with her significant other. She graduated from a university with a bachelor's degree in health sciences and had worked as a retail worker for about a month.

In her questionnaire, Juror 5733944 mentioned defendant's "name sounded familiar to a news article [she] read about a year [ago] about a double homicide." Specifically, she told the prosecutor:

"My friends, probably in January or February, were thinking about starting a crime podcast; so we were going through articles, local articles here, and I had thought when I came a month ago [defendant's] name

17.

sounded familiar, and then you just said two murder victims, and so now I know that I read an article about this before."

Further, she indicated the criminal justice system "has the best intentions but sometimes fails." Specifically, she mentioned an incident with her mom's dad where he was convicted of attempted murder and child molestation, and she believed he did not "[get] the time that was just in that case."

### 3. *Prospective Juror 5747794*

Juror 5747794 was a widowed 41-year-old African-American woman with four children. She graduated with a bachelor's degree in alcohol and drug studies and worked as an alcohol and drug counselor at a prison. Specifically, she "provide[d] treatment plans … and behavioral/criminal … classes to inmates that program at the facility."

In her questionnaire, Juror 5747794 mentioned her views on the criminal justice system are neutral "because it has its pros and cons like anything else." Specifically, she told the prosecutor the system has "its positives and negatives" because people have been "wrongfully convicted" and "everything is changing as far as like, more technology being able to actually place people in certain situations, now I'm looking at it way differently." She also indicated in her questionnaire her "husband was in a street gang prior to [them] getting together" and that "[p]eople who attend a street gang are looking for some type of support that they never had or that's being promised to them."

### B. Applicable Law

We begin with the well-established standards governing *Batson*/*Wheeler* claims. Trial courts have broad discretion over jury selection (*People v. Whalen* (2013) 56 Cal.4th 1, 29-30, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17), and peremptory challenges to excuse potential jurors "are 'designed to be used "for any reason, or no reason at all." ' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 765 (*Armstrong*), quoting *People v. Scott* (2015) 61 Cal.4th 363, 387). "But there are limits: Peremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender. [Citations.] Such

use of peremptory challenges violates both a defendant's right to a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution, and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*Armstrong*, at pp. 765–766.)

With respect to jury selection, " '[t]here "is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." ' [Citations.] Under a now familiar three-step process, a defendant [bringing a *Batson*/*Wheeler* motion] must first 'make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination." ' [Citations.] The defendant's ultimate burden is to demonstrate that 'it was more likely than not that the challenge was improperly motivated.' " (*Armstrong*, *supra*, 6 Cal.5th at p. 766.)

"Where, as here, a trial court finds a prima facie showing of group bias but then denies the *Batson*/*Wheeler* motion based on an evaluation of the strike proponent's reasons for the challenges, 'the reviewing court skips to the third [step] to determine whether the trial court properly credited the [proponent]'s reasons for challenging the prospective jurors in question.' " (*Unzueta v. Akopyan* (2022) 85 Cal.App.5th 67, 80, quoting *People v. Smith* (2018) 4 Cal.5th 1134, 1147.) As to this third step, "[a] [trial] court may make a sincere and reasoned effort to evaluate a peremptory challenge even if it does not provide a lengthy and detailed explanation for its ruling." (*People v. Baker* (2021) 10 Cal.5th 1044, 1077 (*Baker*); see, e.g., *People v. Smith*, at p. 1158; *People v. Jones* (2011) 51 Cal.4th 346, 361; *People v. Mills* (2010) 48 Cal.4th 158, 175–176;

19.

*People v. Lenix* (2008) 44 Cal.4th 602, 625–626.) "Under our precedent, '[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we … assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear out their credibility." (*Baker*, at pp. 1077–1078, quoting *People v. Mai* (2013) 57 Cal.4th 986, 1049, fn. 26.)

As our Supreme Court explained in *Baker*:

> "Because the trial court found a prima facie case of racial discrimination and the prosecutor stated a reason for the strikes at issue, the question before us is whether defendant has shown it ' "more likely than not that" ' at least one of the ' "challenge[s] was improperly motivated." ' [Citations.] 'The existence or nonexistence of purposeful racial discrimination is a question of fact.' [Citation.] [¶] The answer to this factual question will ordinarily depend 'on the subjective genuineness of the race-neutral reasons given for the peremptory challenge.' [Citation.] A justification based on a mischaracterization of the record could reveal a discriminatory motive [citation], but might reflect a mere error of recollection [citations]. Likewise, a justification that is 'implausible or fantastic … may (and probably will) be found to be pretext[ual],' yet even a 'silly or superstitious' reason may be sincerely held. [Citations.] Of course, the factual basis for, and analytical strength of, a justification may shed significant light on the genuineness of that justification—and, thus, on the ultimate question of discrimination. [Citation.] But the force of the justification is significant only to the extent that it informs analysis of the ultimate question of discriminatory motivation." (*Baker*, *supra*, 10 Cal.5th at pp. 1076–1077.)

Therefore, at its essence, the trial court is making a credibility determination. " 'Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613, fn. omitted.)

In light of these rules, "a trial court's ruling on that ultimate question is ordinarily reviewed with deference. ' "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." ' [Citation.] 'A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes.' [Citations.] Thus, '[w]hen the trial court makes a sincere and reasoned effort to evaluate the [proffered] reasons, the reviewing court defers to its conclusions on appeal, and examines only whether substantial evidence supports them.' " (*Baker*, *supra*, 10 Cal.5th at p. 1077, quoting *People v. Melendez* (2016) 2 Cal.5th 1, 15 (*Melendez*).) "By definition, substantial evidence review is deferential to the ruling below—and makes it difficult to show reversible error—due to the prism through which it mandates we review the evidence: We must resolve all conflicts in the evidence in favor of the ruling below [citation], must draw all reasonable inferences from that evidence in favor of the ruling below [citation], and may not reweigh the evidence or any credibility findings." (*Estate of Berger* (2023) 91 Cal.App.5th 1293, 1307.)

## C.     Analysis

Defendant argues the trial court's rulings are not entitled to deference because the court "accepted the comparisons [the prosecutor] outlined without undertaking comparative analysis of its own and without conducting its own examination of the record." However, a lengthy and detailed explanation is not a prerequisite to a "sincere and reasoned effort to evaluate a peremptory challenge." (*Baker*, *supra*, 10 Cal.5th at p. 1077.) Rather, "[u]nder our precedent, '[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we … assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their

21.

credibility.' " (*Id*. at pp. 1077–1078.)  With that being said, a defendant can overcome this assumption by showing that " 'the proffered reasons lack[] inherent plausibility or [are] contradicted by the record' " or the record establishes the trial court misunderstood the standard to be applied.  (*Id*. at p. 1078.)  As we discuss in detail below, the trial court's denial of defendant's two *Batson*/*Wheeler* motions is supported by substantial evidence because the prosecutor provided sincere, neutral reasons for the excusals.

### 1. *The First Batson/Wheeler Motion*

As noted above, after the prosecutor's eighth peremptory challenge, trial counsel made a *Batson*/*Wheeler* motion.  Trial counsel alleged the prosecutor excused Juror 5660560 and Juror 5733944 based on race.  The trial court found trial counsel established a prima facie case of discrimination and asked the prosecutor to explain her reason(s) for the excusals.

### a. <u>The Prosecutor's Fifth Peremptory Challenge of Juror 5660560</u>

The prosecutor identified two reasons for her dismissal of Juror 5660560, specifically Juror 5660560's current employment as a program specialist with the Kern County Probation Department *and* her past employment as a social worker for eight and a half years, and the fact she mentioned at times the criminal justice system is not fair.  However, the prosecutor's "main reason for kicking her was the employment" and argued that "in [her] experience of doing this for approximately 13 years, [she] tend[ed] to believe social workers and counselors, especially those that work with convicted criminals, tend to be more sympathetic towards criminal defendants."

We find the prosecutor's justifications for this challenge to be legitimate, neutral reasons.  For purposes of *Batson*/*Wheeler*, "a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection."  (*Purkett v. Elem* (1995) 514 U.S. 765, 769.)  "For example, a peremptory challenge based on a prospective juror's experience in counseling or social services, and the prosecutor's concern that such a

person might be too sympathetic to the defense, have been held as proper race-neutral reasons for excusal." (*People v. Arellano* (2016) 245 Cal.App.4th 1139, 1163, citing to *People v. Clark* (2011) 52 Cal.4th 856, 907–908.) Juror 5660560 was a program specialist at the prison and had worked as a social worker for eight and a half years, which raised the prosecutor's concern she would be overly sympathetic towards defendant. Further, although not her primary reason, the prosecutor was also concerned with the fact Juror 5660560 believed at times the criminal justice system is not fair, which is also by itself a valid neutral reason. (See *People v. Winbush* (2017) 2 Cal.5th 402, 439 (*Winbush*) [" 'A prospective juror's distrust of the criminal justice system is a race-neutral basis for excusal' "].) These two justifications were legitimate, neutral reasons justifying Juror 5660560's excusal.

### b. The Prosecutor's Eighth Peremptory Challenge of Prospective Juror 5733944

The prosecutor identified two reasons for her dismissal of Juror 5733944, specifically her "youth and inexperience" and the fact "she wanted to start a podcast, a crime podcast" because in the prosecutor's experience "anyone in the news-reporting-type business is more liberal rather than conservative in sort of questioning what police did, the thoroughness of police work, things of that nature, things that could be done to help." Further, as it related to Juror 5733944's work experience, the prosecutor argued she lacked "significant life experience that other jurors possess to sit on a homicide case."

As to Juror 5733944, we also find the prosecutor's justifications for this challenge to be legitimate, neutral reasons for excusal. First, "[a] potential juror's youth and apparent immaturity are race-neutral reasons that can support a peremptory challenge." (*People v. Lomax* (2010) 49 Cal.4th 530, 575.) The prosecutor reasonably believed Juror 5733944's lack of work experience made it difficult for her "to sit on a homicide case" because she was only 22 years old and had worked in retail for only one month. Second, Juror 5733944's interest in starting a crime podcast was a race-neutral basis for the

prosecutor's challenge. (*Richardson v. State* (Ind.Ct.App. 2019) 122 N.E.3d 923, 929 ["[A] potential juror's interest in law-related books and television shows has been found to be a permissible ground for the State's peremptory challenge."]; see *United States v. Farhane* (2d Cir. 2011) 634 F.3d 127, 157–158 [providing that it was plausible for the prosecutor to think that a juror who regularly watched television shows such as CSI might be more inclined to think that forensic evidence is necessary to prove guilt]; see also *United States v. Murillo* (9th Cir. 2002) 288 F.3d 1126, 1136 [finding the juror's statement that Judge Judy was her favorite television show was a permissible ground for the prosecutor's peremptory challenge].) Juror 5733944's youth and inexperience, and her heightened interest in the criminal justice system served as legitimate, neutral reasons justifying excusal.

The trial court, after hearing argument from both trial counsel and the prosecutor, specified its reasons for denying the first *Batson/Wheeler* motion. (*Baker*, *supra*, 10 Cal.5th at pp. 1077–1078.) The trial court concluded, "[A]ppellate courts have recognized a valid reason in excusing individuals for employment stereotypes, as well as youth reasons or prospective jurors being young" and that it "has appreciated the comparative analysis conducted by [the prosecutor] in explaining that those reasons have been relied on by her to release individuals other than or in addition to the two prospective jurors that have been challenged." Accordingly, after reviewing both the prosecutor's justifications, coupled with the trial court's analysis, we conclude substantial evidence exists to support the conclusion that neutral reasons existed justifying both Juror 5660560's and Juror 5733944's excusal.

### 2. *The Second Batson/Wheeler Motion*

Subsequently, as noted above, after the prosecutor's 12th peremptory challenge, trial counsel made a second *Batson/Wheeler* motion. Trial counsel again alleged the prosecutor excused Juror 5747794 based on race. The trial court found defendant made a

prima facie showing of discrimination and again provided the prosecutor an opportunity to explain the challenge.

The prosecutor identified two reasons for her dismissal of Juror 5747794; specifically, her employment as an alcohol and drug counselor for the prison and the fact her husband was previously in a gang and believed "street gangs are looking for a support group."

As to Juror 5747794, we also find the prosecutor's justifications for this challenge to be legitimate, neutral reasons for excusal. First, as we noted above, "a peremptory challenge based on a prospective juror's experience in counseling or social services, and the prosecutor's concern that such a person might be too sympathetic to the defense, have been held as proper race-neutral reasons for excusal." (*People v. Arellano*, *supra*, 245 Cal.App.4th at p. 1163, citing to *People v. Clark*, *supra*, 52 Cal.4th at pp. 907–908.) Second, "our Supreme Court held that contacts with members of street gangs where the prospective juror lived provided support for the prosecutor's bias concerns." (*People v. Cox* (2010) 187 Cal.App.4th 337, 348, citing to *People v. Watson* (2008) 43 Cal.4th 652, 679–680.) Juror 5747794's employment and the fact her husband was a former gang member constituted neutral reasons for excusal.

The trial court then denied trial counsel's second *Batson/Wheeler* motion and reasoned that in her questionnaire, Juror 5747794 made "responses regarding her husband being killed by another gang member and open-mindedness and so forth, in addition to people who attend a street gang are looking for some type of support … [and] [t]hat is significant because it does involve a reason that [the prosecutor] has provided on the record." Further, the trial court agreed with trial counsel "that if an African-American individual was released and there was *one* comment used as justification to release that person, but when reviewing the venire in its entirety through a comparative analysis other individuals remained on the panel that were substantially similarly situated to the person released, there would call into question a serious concern regarding the justified

25.

reasoning in exercising a peremptory challenge." (Italics added.) However, the trial court reasoned "[the prosecutor] … conducted a comparative analysis herself as it relates to exercising peremptory challenges to release individuals who [were] similarly situated to the three individuals in question … [and therefore,] [¶] [i]n considering the comments made by [the prosecutor], the Court [found] that the reasons given for challenging [Juror 5747794] [were] group neutral." Accordingly, we conclude " 'the trial court ma[de] a sincere and reasoned effort to evaluate the [proffered] reasons' " provided by the prosecutor, and that substantial evidence exists to support the conclusion that neutral reasons existed justifying Juror 5747794's excusal. (*Baker*, *supra*, 10 Cal.5th at p. 1077.)

### 3. *Comparative Juror Analysis*

Defendant further asks this court to conduct comparative juror analysis to determine whether the prosecutor engaged in purposeful discrimination. Comparative juror analysis evidence " 'is one form of relevant circumstantial evidence' " (*People v. Hardy* (2018) 5 Cal.5th 56, 77, quoting *Melendez*, *supra*, 2 Cal.5th at p. 15) and when undertaken, a court "engages in a comparison between, on the one hand, a challenged panelist, and on the other hand, similarly situated but unchallenged panelists who are not members of the challenged panelist's protected group." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1173.)

> " 'The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor. [Citations.]' [Citation.] 'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.' [Citation.] 'At the same time, "we are mindful that comparative juror analysis on a cold appellate record has inherent limitations." [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. "Two panelists might give a similar answer on a given point. Yet the risk posed

by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." [Citation.]' " (*Winbush*, *supra*, 2 Cal.5th at p. 442; accord, *People v. Woodruff* (2018) 5 Cal.5th 697, 754.)

"Pretext is established, however, when the compared jurors have expressed 'a substantially similar combination of responses,' in all material respects, to the jurors excused. [Citation.] Although jurors need not be completely identical for a comparison to be probative [citation], 'they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge.' " (*Winbush*, *supra*, 2 Cal.5th at p. 443, italics omitted.)

### a. Comparison Between Challenged Juror 5660560 and Prospective Juror Nos. 5966643 and 5890284

In comparison to Juror 5660560, defendant argues that "despite [the prosecutor's] claimed suspicion of social workers, she did not challenge" Juror No. 5966643 (Juror 5966643) and Juror No. 5890284 (Juror 5890284), who were both similarly situated as Juror 5660560. Although Juror 5966643 was a 28-year-old Caucasian female social worker with the Wraparound Program, she indicated during questioning that she "work[ed] with foster and probation youth" to "try to stabilize their placement, figure out what's going on," which is different than working with *adult* convicts in prison. (*Winbush*, *supra*, 2 Cal.5th at p. 443.) Further, Juror 5660560 believed the criminal justice system can be unfair because she knew of two people who "ha[d] been in situations where [she] think[s] they were just prejudged and weren't given a fair opportunity, where people just automatically assumed things," whereas, Juror 5966643 believed the criminal justice system can be improved because "every system could be improved, like nothing's perfect." Unlike Juror 5660560, who had a personal, negative experience with the criminal justice system, Juror 5966643's statement represented a broad, unemotional response to the criminal justice question, negating the possibility of

27.

bias against the prosecutor's case.  Accordingly, Juror 5660560 and Juror 5966643 were not materially similar.

Additionally, Juror 5890284 was a 52-year-old Asian female psychologist at the prison and worked as a "supervisor for 12 years" and does not work with inmates, but rather "do[es] administrative supervisory stuff."  Further, she indicated in her questionnaire that her "friends have both good [and] bad experiences with law enforcement," but clarified during questioning she "kind of grew up in the wrong side of the town; so there was a lot of involvement with law enforcement … [a]nd then as [she] became an adult, [she] worked in the criminal justice system; so, you know, now the majority of [her] friends are in law enforcement, so both sides."  Juror 5890284's employment position is much different than Juror 5660560's position because Juror 5660560's position required her to work regularly with inmates.[25]  Further, Juror 5890284's opinion of the criminal justice system was much more neutral than that of Juror 5660560 because a majority of Juror 5890284's friends were in law enforcement, and she herself stated she had experienced "both sides" of the system.  Accordingly, Juror 5660560 and Juror 5890284 were not materially similar.[26]

---

[25]  The prosecutor's concern with Juror 5660560's regular contact with inmates is corroborated by the fact she also used her sixth peremptory challenge against Juror 5789003, who identified herself as a 34-year-old Caucasian female who worked at the prison as a "[l]icensed vocational nurse" and had "daily" contact with its inmates.

[26]  Defendant also argues that because the prosecutor questioned Juror 5660560, but not Juror Nos. 5667252 (Juror 5667252), 5788922 (Juror 5788922), and 5664671 (Juror 5664671), regarding their "neutral" questionnaire responses regarding the criminal justice system "shows her purported concern about this subject was a pretext."  However, each of these three jurors' responses were distinguishable from Juror 5660560's response.  Juror 5667252 stated the criminal justice system "works, most of the time;" Juror 5788922 only circled "neutral" without providing any further response; and Juror 5664671 indicated "that all points of views have to be taken into consideration," which is exactly what any litigant, regardless of side, desires in a juror.  Accordingly, we are not convinced the prosecutor's concern with Juror 5660560's personal views and experiences with the criminal justice system "was a pretext."

28.

**b.** **Comparison Between Challenged Juror No. 5733944 and Sitting Juror Nos. 5664671, 5879303 and 5775951**

Defendant further contends Juror 5733944 was materially similar with Juror 5664671, Juror No. 5879303 (Juror 5879303), and Juror No. 5775951 (Juror 5775951) because they all watched or consumed crime television or books. In their questionnaires, Juror 5664671 stated she watched "CrimeTV" and read "crime" books, and Juror 5879303 and Juror 5775951 both indicated they read crime related books. Defendant argues the prosecutor's excusal of Juror 5733944 based on her interest in starting a crime podcast was pretextual because Juror 5733944's "interest in true crime was more like Juror 566467[1]'s interest in Crime TV or the others' taste in fiction yet [the prosecutor] excused [Juror 5733944], not the others." However, these three sitting jurors' mere consumption of crime-related media is much different than Juror 5733944's desire to devote her life to starting a crime podcast, which would have required copious amounts of research into criminal cases. Further, as noted above, the prosecutor referenced Juror 5733944's "youth and inexperience," as a separate justification for excusal, which by itself is a race-neutral basis for excusal. (*People v. Lomax*, *supra*, 49 Cal.4th at p. 575.)

**c.** **Comparison Between Challenged Juror 5747794 and Challenged Juror No. 5914024**

Defendant further contends the prosecutor's "professed concern about [Juror 5747794's] views [about gangs] was not … 'related to the particular case to be tried' [citation], and so shows the pretextual natu[r]e of the strike." Specifically, defendant argues "there was no testimony tying the murders to gangs and only some suggestion of [defendant's] gang membership" and, therefore, the prosecutor's concern regarding a jurors' views on gangs was unwarranted. However, as noted above "our Supreme Court held that contacts with members of street gangs where the prospective juror lived provided support for the prosecution's bias concerns." (*People v. Cox*, *supra*, 187 Cal.App.4th at p. 348, citing to *People v. Watson*, *supra*, 43 Cal.4th at pp. 679–680.) As defendant concedes, there was "some suggestion of [defendant's] gang membership"

29.

and, therefore, it was reasonable for the prosecutor to be concerned with potential bias. Further, although the prosecutor argued her challenge to Juror 5747794 was comparable to her challenge to Juror 5914024, defendant argues "the two are not at all comparable." Regardless of the two jurors' comparability, the prosecutor was obviously concerned with both Juror 5747794's and Juror 5914024's experience with the criminal justice system and, thus, ended up using peremptory challenges against both jurors. Therefore, the prosecutor's use of a peremptory challenge against Juror 5747794 was proper.

### 4. *Other Factors*

Finally, defendant argues "[t]he prosecutor's use of peremptories to exclude all the African-American woman shows the challenges were indeed based on race." Although a *Batson/Wheeler* violation may be found if the prosecutor " ' " 'struck most or all of the members of the identified group from the venire,' " ' " the reviewing court also considers whether the prosecutor " ' " 'used a disproportionate number of his [or her] peremptories against the group.' " ' " (*People v. Taylor* (2010) 48 Cal.4th 574, 615, quoting *People v. Kelly* (2007) 42 Cal.4th 763, 779.)

Originally, there were six African-American women in the venire. Two of the African-American women were excused—one because of exposure to COVID-19 and the other for cause. A third African-American woman was never called to the panel. Therefore, of the six African-American women who originally filled out questionnaires, only three were called to the panel and questioned. Although the prosecutor did excuse all three remaining African-American women in the 82-person venire, these three peremptory challenges only represented 19 percent of the prosecutor's 16 peremptory challenges.

We find *People v. Harris* (2013) 57 Cal.4th 804 (*Harris*) instructive. In *Harris*, the defendant argued "the prosecutor improperly exercised peremptory challenges against two African-American prospective jurors … on the basis of race." (*Id*. at p. 833.) In that case, "[t]hree of the 69 prospective jurors in the jury pool were African-American" and

30.

"[o]ne African-American woman ultimately served on defendant's jury." (*Id*. at p. 834.) The court affirmed the trial court's denial of the *Batson*/*Wheeler* motion at the prima facie stage because "the record … shows apparent race-neutral reasons for the prosecutor's excusals" of the jurors. (*Id*. at p. 835.) Additionally, the court noted "the small number of African-Americans in the jury pool makes 'drawing an inference of discrimination from this fact alone impossible.' ([*People v.*] *Bell* [(2007)] 40 Cal.4th [582,] 597–598 [no inference of discrimination when prosecutor excused two of the three African-American women on the panel]; see *People v. Bonilla* (2007) 41 Cal.4th 313, 343 [' " 'As a practical matter … the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion.' " [Citations.]'].)" (*Harris*, at p. 835, italics omitted.) Here, these three excused jurors were in a venire of 82 prospective jurors. This "small number of African-Americans in the jury pool makes 'drawing an inference of discrimination … impossible.' " (*Ibid*.)

Further, the prosecutor extensively questioned all three of the challenged jurors in addition to considering the prospective jurors' questionnaires[27] (cf., *People v. Kelly*, *supra*, 42 Cal.4th at p. 779 [a prima facie case of discrimination "may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all"]), and as we discussed above, the prosecutor provided neutral justifications for each challenge thereby diminishing the likelihood of a discriminatory purpose behind the challenges. (*Baker*, *supra*, 10 Cal.5th at p. 1077.) In the end, as our high court observed in *Batson*, "We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a … case of discrimination against black jurors." (*Batson*, *supra*,

---

[27]    It is important to note that a court " 'place[s] little weight on the prosecutor's failure to individually or more thoroughly question a prospective juror before exercising a peremptory challenge' " where the "prosecutor had a detailed jury questionnaire to review" before voir dire. (*Melendez*, *supra*, 2 Cal.5th at p. 19.)

31.

476 U.S. at p. 97, italics omitted.) Accordingly, in consideration of this deference, we conclude substantial evidence supports the trial court's denial of trial counsel's two *Batson*/*Wheeler* motions.

## II. The Trial Court Did Not Err in Admitting Paul Greene's Testimony Regarding the ShotSpotter Technology

Defendant further contends the trial court erred in admitting ShotSpotter evidence under *Kelly*, and that Greene lacked the necessary qualifications to testify as an expert on the ShotSpotter technology. As to both contentions, we disagree.

### A. Additional Factual Background

As noted above, ShotSpotter is "a company that has developed, installs, and operates the ShotSpotter gunshot detection and location system," which "is an acoustic gunshot detection and location system." ShotSpotter "install[s] an array, a number of microphone sensors, in a neighborhood or an area that [their] customer, typically the police, they identify" and "[t]hose sensors listen specifically for impulsive noises … specifically, the sounds of gunfire."

#### 1. *Paul Greene's Background*

Paul Greene was the manager of forensic services at ShotSpotter and had been employed with the company for over 14 years. Although Greene only possessed a high school diploma, in 2004, he worked for the United States Joint Forces Command "doing systems integration, testing, different types of sensors … and integrating those sensor systems into a common operating picture system where a unit or incident commander could easily see all the electronic assets … available to [them]." Two years later, he worked for the New Mexico Institute of Mining and Technology "managing the IT department and the command and control systems at the Playas Training & Research Center in Playas, New Mexico." He "deal[t] with multiple vendors supplying sensor systems, which [he] would install on [their] ranges, integrate them into [their] systems,

and then run military police and Homeland Security exercises against those systems and then record the results."

In 2007, Greene started working for ShotSpotter and installed sensors, repaired sensors, and ran live-fire tests with new customers, and live-fire tests with research and development testing for the company. His "current role as the manager of forensic services is primarily … to perform a forensic review of gunshot incidents that are captured by ShotSpotter." It is also his "responsibility to develop training material and certification material for new experts that [they] hire in the future." He also had "a hand in developing policies and procedures that [they] employ for forensic examination and for expert testimony." Greene had been qualified and had testified as an expert in this area of the ShotSpotter technology 115 times throughout the United States, and is one of two ShotSpotter experts in the world.

### 2. *The ShotSpotter Technology*

Greene described the ShotSpotter technology as follows:

> "So we have a neighborhood, a large area, a couple square miles, that has a number of ShotSpotter sensors installed. Somebody inside of that ShotSpotter array fires a gun. The bang, the muzzle blast of that weapon being fired, the sound of that muzzle blast, travels outward in all directions at the speed of sound. As it travels outward in all directions, it is detected by ShotSpotter sensors at different times, because—at different distances and different times.

> "The sensors then, when they detect it, we call that detection time the arrival time. It then reports the arrival time back to our location server software.

> "And in the location server software, the first thing it tries to do is calculate the geographic location of where the weapon was fired, the origin of that impulsive noise, and we do that by using a mathematical system called multilateration, which is very similar—some of you might know of or have heard of triangulation.

> "Triangulation is where you use two known points to locate an unknown point on the map or in space.

33.

"Multilateration, we're using many known points to determine the location of an unknown point, in this case the many known points being we know the exact location of every ShotSpotter sensor in the array, and the unknown point being where the weapon was fired.

"So as an example, we'll simplify how this works and we'll limit it to three sensors detecting a single gunshot.

"So again, the muzzle blast, the sound of that muzzle blast, travels outward and is detected by sensors A, B, and C at slightly different times because they are at different distances from the shooting location. They report the arrival time back to the location server.

"The location server then will find the differences in time, differences in arrival times, between as many unique pairs of sensors as possible; so with three sensors, we can make three unique pairs. [¶] … [¶]

"We then take that geographic coordinate. We then convert it to a street address using a third-party software. We then attempt to characterize or label it as a type of gunfire or something other than gunfire.

"Once we do that, we then issue an alert. The software issues an alert.

"The first person to see that alert is the ShotSpotter incident review center. The incident review center is staffed 24 hours a day, seven days a week. They are trained people who are going to acknowledge receipt of that alert. They're going to be able to listen to audio clips of the shooting incident or of the impulsive incident. And they're going to make a judgment call.

"If they really believe that it's gunfire, then they'll publish it. They'll publish it and they'll send it directly to our customers to be acted upon.

"If they don't believe that it's gunfire for whatever reason, they can dismiss the alert. Even if they dismiss the alert, we still save all of the data just in case we're wrong.

"But all of this, the detection, the location, the classification, and the alert that's sent to our customers all occurs in typically under 60 seconds. Even more typically around 45 seconds. So it's very quick.

"And that's how ShotSpotter works."

34.

### 3. *Trial Counsel's Motion to Strike*

After Greene's testimony concluded, trial counsel "ask[ed] that all of his testimony, 'his' being Mr. Greene's testimony, be stricken." Specifically, trial counsel argued the following in support of his motion to strike:

> "First of all, there is, to me, a big *Kelly-Frye* issue. ShotSpotter, I contend, is not a science. There's no indication that it's widely accepted in the scientific community.

> "Even if it were, Mr. Greene doesn't have the educational background or credentials to testify as an expert. Basically, what he did was get up on the witness stand and give a promotional speech. He's not qualified to make the—draw the conclusions that he did, to give the testimony he did, both because it's not a science and, secondly, he's not qualified even were it a science.

> "Secondly, he testified—when I asked him, I said, so the person who really made the observations is the person we're not going to hear testify in this court, and he said, 'Yes.'

> "And the long and the short of it is that we have to rely on him and his recollection of what some other person said about his or her perceptions over a year ago, and now that person is insulated from cross-examination by the defense because she's not here to testify and Mr. Greene is testifying for her, and I think that's the essence in *Crawford*[28] is we get to the people who really did the work and got the information, not someone to whom she writes a report." (Italics added.)

The prosecutor responded that she did not believe *Kelly* was "implicated in any way" because Greene "testified 115 times in courts throughout this country, a quarter of which were in the State of California" and that *Crawford* is not implicated because "the sensor is what delivers the data to ShotSpotter," and "[j]ust because someone received the data and put it into the system, [Greene] is the one who examined the data, analyzed it, and authored a report. No one else did." (Italics added.) The trial court subsequently denied trial counsel's motion to strike and stated the following:

---

**28**    *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

35.

"Counsel, for purposes of determining a witness's qualifications to testify as an expert witness, the Court must consider the testimony itself, along with all the other circumstances surrounding the individual's testimony.

"It's apparent to the Court that Mr. Greene was proffered as an expert in the ShotSpotter technology, and he went through his curriculum vitae in that regard.

"Evidence Code [s]ection 720 does articulate the qualifications of an expert witness, and one circumstance is an individual who has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on a subject to which his testimony relates.

"Firstly, the subject matter of ShotSpotter generally, this Court finds, is beyond the common knowledge of a layperson, and therefore a qualified witness's testimony regarding that subject matter could aid and assist the jury in understanding the information provided and ultimately considering that information.

"Mr. Greene's experience as it relates to working on networks and so forth, even his training in the military, to such an extent, the accumulated training and experience with firearms and so forth, does put him above and beyond what a normal citizen and its knowledge would have.

"Additionally, it does appear that he was qualified to perform the job that he was asked to do when he joined ShotSpotter back in the 2000s.

"The Court does, therefore, find that he is qualified as an expert witness in this area and, for the reasons previously stated, would aid and assist the jury.

"The other issue in this case regarding *Crawford* is to determine the applicability of *Crawford* and whether there was hearsay information relied upon by Mr. Greene in formulating whatever opinion that he formulated.

"Now, firstly, there was testimony procedurally of what happens when a ShotSpotter sensor is triggered.  There is an operator that works for ShotSpotter who reviews the information and then processes that information.

"Mr. Greene's role in this case was not in talking with nor relaying to the jurors what another person told him.  That would be, arguably, hearsay and that would violate *Crawford* if it involved case-specific facts.

36.

"Mr. Greene's role, however, was to review data that was obtained from the sensors.  After reviewing that data, he validated the data or determined its validation.  He then recorded the data into a report, and included in recording that data is creating a geolocation map for the longitudinal and latitudinal lines from the sensor, in addition to the recording.

"He testified about the procedure that he utilizes, as well as the minimum requirement of sensors necessary on a single gunshot versus multiple gunshots.  He also explained how the geolocation is formulated mathematically by utilizing the sensors and the acoustic resonance derived from whatever sound was obtained.

"He also indicated that, based on his training and experience, he could discern whether a sound is a gunshot or is not a gunshot.

"For purposes of *Crawford*, since Mr. Greene did not rely on conversations with other human beings or individuals, it does not appear that a *Crawford* issue has even been raised.  Mr. Greene's testimony involved his own independent review of data received from the sensors involved, as well as recording that data and interpreting that data.  That is information that this jury certainly can consider.

"To a certain extent, they must determine what credibility, if any, to give Mr. Greene, as well as the weight, if any, they will give to the exhibits testified to by Mr. Greene, but it is not a *Crawford* issue."  (Italics added.)

## B.    Forfeiture

At the outset, the People contend that trial counsel forfeited the *Kelly* argument by failing to raise this claim in a timely manner.  Specifically, the People argue defendant "declined to have a pretrial hearing on the foundation of the ShotSpotter evidence under Evidence Code section 402" and did not raise a *Kelly* claim at any point during the examination of Greene, and it was "[o]nly after Greene was released as a witness and after the court had moved on to other business, did [defendant] raise *Kelly*[] in support of his motion to strike."  We agree.

The *Kelly* issue must be raised promptly by specific objection, or otherwise the issue is waived on appeal.  (*People v. Cooper* (1991) 53 Cal.3d 771, 812; *People v. Stanley* (1984) 36 Cal.3d 253, 260–261.)  Furthermore, the trial court is not obligated to raise the issue and hold a *Kelly* hearing *sua sponte* absent a timely and proper objection

37.

from counsel. (*People v. Kaurish* (1990) 52 Cal.3d 648, 688.) Here, prior to Greene's testimony, the prosecutor inquired as to whether the trial counsel wanted an Evidence Code section 402 hearing to question Greene regarding the ShotSpotter technology, but trial counsel responded, "Actually, since he'll be testifying as an expert witness, I assume, I think I can cover the same ground on cross-examination as I could in a[n] [Evidence Code section] 402 [hearing] with less time." The trial court then asked trial counsel, "So I understand that to mean, [trial counsel], you're not asking for a[n] [Evidence Code section] 402 hearing on it, but you will determine its admissibility if and when the individual testifies in front of the jury?" Trial counsel replied, "Yes, sir." Trial counsel did not raise a *Kelly* objection until *after* Greene had testified and was released from the trial. Had trial counsel raised a *Kelly* objection prior to the trial, the trial court could have properly weighed *Kelly*'s applicability as it related to Greene's testimony before the jury heard the evidence. However, trial counsel's failure to do so deprived the trial court from weighing the ShotSpotter evidence before it was presented to the jury. (See *People v. Lewis* (2008) 43 Cal.4th 415, 481 ["Failure to press for a ruling on a motion to exclude evidence forfeits appellate review of the claim because such failure deprives the trial court of the opportunity to correct potential error in the first instance"], overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919–920.) Therefore, this untimely objection forfeited this claim on appeal. In any event, however, we also conclude this claim fails on its merits.

## C. The ShotSpotter Technology Did Not Require a *Kelly* Hearing

Defendant argues the trial court erred when it refused to hold a *Kelly* hearing because "when the defense requests a hearing on the scientific reliability of the ShotSpotter technology, it is error to refuse." First and foremost, as noted above, trial counsel did not raise a *Kelly* issue until *after* Greene's testimony had already concluded and he had been dismissed from the trial; thus, it was not error for the trial court to deny the motion to strike after the jury had already heard the testimony. Second, as we discuss

38.

in detail below, the ShotSpotter technology did not require a *Kelly* hearing to be admissible.

### 1. *Applicable Law*

"Under the *Kelly* rule, ' "when faced with a novel method of [scientific] proof, [we] have required a preliminary showing of general acceptance of the new technique in the relevant scientific community" before the scientific evidence may be admitted at trial.' [Citations.] *Kelly* 'renders inadmissible evidence derived from a "new scientific technique" unless the proponent shows that (1) "the technique is generally accepted as reliable in the relevant scientific community"; (2) "the witness testifying about the technique and its application is a properly qualified expert on the subject"; and (3) "the person performing the test in the particular case used correct scientific procedures." ' " (*Nieves*, *supra*, 11 Cal.5th at p. 444.) "[T]here is no clear definition of science" and, thus, "the application of that term is guided by resort to the 'narrow "common sense" purpose' behind the rule: 'to protect the jury from techniques which … convey a " 'misleading aura of certainty.' " ' … The analysis is designed to address 'scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.' " (*People v. Lucas* (2014) 60 Cal.4th 153, 223–224, disapproved in part on another ground in *People v. Romero and Self*, *supra*, 62 Cal.4th at p. 53, fn. 19.)

"Not every subject of expert testimony needs to satisfy the *Kelly* test. Courts determining whether *Kelly* applies must consider, first, whether the technique at issue is novel, because *Kelly* ' "only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is new to science and, even more so, the law." ' [Citation.] Second, courts should consider whether the technique is one whose reliability would be difficult for laypersons to evaluate. A '*Kelly* hearing may be warranted when "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only

39.

accurately recognize and relay to the jury." ' [Citation.] Conversely, no *Kelly* hearing is needed when '[j]urors are capable of understanding and evaluating' the reliability of expert testimony based in whole or in part on the novel technique." (*People v. Peterson* (2020) 10 Cal.5th 409, 444 (*Peterson*), italics omitted.) "Appellate courts review de novo the determination that a technique is subject to *Kelly*" (*People v. Jackson* (2016) 1 Cal.5th 269, 316), and we also review de novo "the trial court's evaluation regarding whether a new scientific technique is generally accepted as reliable in the relevant scientific community" (*Nieves*, *supra*, 11 Cal.5th at p. 444).

### 2. *Analysis*

Defendant argues the trial court erred in admitting the ShotSpotter evidence based "on a novel scientific method as part of its proof" "to prove when the shots were fired and, to a lesser extent, how many shots there were." In support, defendant relies heavily on the First District, Division Two's opinion in *People v. Hardy* (2021) 65 Cal.App.5th 312 (*Hardy*), which held, "Shotspotter's technology remains sufficiently novel to merit our courts' review of it under *Kelly*[] to determine its scientific validity and reliability" and thus, "because there was no *Kelly*[] hearing, the prosecution failed to meet its burden of satisfying the three prongs of the *Kelly*[] reliability test." (*Id*. at pp. 327–328.)

Based on Greene's testimony, we are unconvinced the ShotSpotter system requires *Kelly* review. Greene testified that in order to determine whether an incident involved gunfire, the review operator "listen[s] to audio clips that were recorded by the various sensors, at least four sensors" and "they're trying to not necessarily determine is this truly gunfire," but rather, "[t]heir job is mostly to weed out those incidents that are absolutely definitely not gunfire." He further testified that ShotSpotter "detect[s] and accurately locate[s] at least 90 percent of all outdoor and unsuppressed gunfire," but did

acknowledge there was no external control that would validate the technology's accuracy.[29]

This testimony does not suggest the ShotSpotter process for identifying gunshots is based on a novel method of scientific proof. (*Nieves*, *supra*, 11 Cal.5th at p. 444.) Specifically, the review operator, after listening to audio clips, makes the ultimate determination as to whether the incident involved gunshots with 90 percent accuracy. The process of listening to sounds and determining whether they sound like gunshots is not a scientific technique, let alone a novel one. Indeed, both expert and lay witnesses regularly testify regarding the sounds of gunshots. (See, e.g., *People v. Fuiava* (2012) 53 Cal.4th 622, 671–673; *People v. Harris* (1989) 47 Cal.3d 1047, 1063; *People v. Mathews* (2018) 21 Cal.App.5th 130, 133; see also *People v. Bell* (2019) 7 Cal.5th 70, 104 [admission of audio recording of gunshots from crime scene surveillance video]; Evid. Code, § 720, subd. (a).)

Based on the foregoing, the process for characterizing sounds as gunshots does not purport to " ' "provide some definitive truth which the expert need only accurately recognize and relay to the jury." ' " (*Peterson*, *supra*, 10 Cal.5th at p. 444.) Furthermore, Greene acknowledged the imperfections of the system and testified that ShotSpotter "give[s] [their] customers a limited performance guarantee," thereby

---

[29] Another court considering the admissibility of ShotSpotter evidence explained: "The digital signal processors of the sensors measure sound input to determine if the sound meets 28 different audio characteristics of 'impulsive audio pulses,' or a 'bang, boom, or pop,' and could thus be categorized as a possible gunshot." (*State v. Hill* (Neb. 2014) 851 N.W.2d 670, 679.) "If the sound meets the preprogrammed criteria for a possible gunshot," it is transmitted to the central location server for review by a human reviewer, who rules out a false positive. (*Ibid.*) The court concluded the ShotSpotter system was sufficiently reliable under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 (*Daubert*) and corresponding state case law, and the evidence therefore could be presented to the jury. (*State v. Hill*, at pp. 690–691.) We acknowledge our Supreme Court has declined to adopt the *Daubert* standard, under which widespread acceptance of a scientific technique is not required for admissibility. (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831, fn. 7.)

41.

dispelling any " ' " 'misleading aura of certainty' " ' " regarding the process. (*People v. Lucas*, *supra*, 60 Cal.4th at p. 223.) In light of these circumstances, we do not believe jurors would be incapable of understanding and evaluating the reliability of this process for classifying sounds as gunshots or nongunshots. (See *Peterson*, at p. 444.) Accordingly, we conclude Greene's testimony regarding the characterization of particular sounds as gunshots was not required to satisfy the *Kelly* test before it could be admitted.

Nevertheless, defendant relies on *Hardy* in support of his argument the trial court erred in failing to conduct a *Kelly* hearing. In *Hardy*, "the prosecutor introduced the Shotspotter evidence through … the undercover officer who had surveilled the scene on the night of the incident from a car parked … across from the store." (*Hardy*, *supra*, 65 Cal.App.5th at p. 322.) "[T]he prosecutor asked [the officer] about Shotspotter [and the officer] … said it was 'technology that we have in Oakland that we use that detects the sound of gunfire,' *but that the police department did not operate it*." (*Id*. at p. 323, italics added.) Prior to the officer's testimony, the defendant moved to exclude the ShotSpotter evidence in his motions in limine, but "[t]he trial court denied [the defendant's] motion in limine without conducting an evidentiary hearing to determine whether Shotspotter's technology meets the standard of scientific reliability under *Kelly*[], although the defense requested such a hearing." (*Id*. at p. 324.) The *Hardy* court reversed because the "Shotspotter's technology remains sufficiently novel" and "the trial court was required to review the Shotspotter evidence under *Kelly*[] when offered to prove the number of shots fired before admitting it [and] [t]herefore, the trial court erred by failing to do so." (*Id*. at pp. 327–328.)

*Hardy* is distinguishable from this case. Unlike in *Hardy*, trial counsel *never* made a motion to "exclude the ShotSpotter evidence" in his motions in limine (*Hardy*, *supra*, 65 Cal.App.5th at p. 321), but rather, after the trial court provided him an opportunity to conduct an Evidence Code section 402 hearing to inquire as to the ShotSpotter technology and Greene's expert qualifications, decided to "cover the same

ground on cross-examination as [he] could in a[n] [Evidence Code section 402 hearing] with less time." Most importantly, the prosecutor did not call an officer whose "police department did not operate [ShotSpotter]" (*id*. at p. 323), but rather called Greene, who was a manager of forensic services at ShotSpotter for over 14 years and had been qualified and had testified as an expert in this area 115 times throughout the United States.

Regardless, even if we assume the ShotSpotter technology is subject to *Kelly* review, we need not determine whether it meets the *Kelly* requirement of being " ' "generally accepted as reliable in the relevant scientific community." ' " (*Nieves*, *supra*, 11 Cal.5th at p. 444.) This is because, as we describe in detail below, any conceivable error in admitting ShotSpotter evidence regarding the classification of sounds as gunshots was harmless. *Kelly* is the state law standard for admissibility of scientific evidence. (See *People v. Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 831, fn. 7.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional … test" under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Our Supreme Court has confirmed that *Kelly* error is subject to *Watson* review for harmlessness, which focuses on what the jury was likely to have done in the absence of the error under consideration.[30] (*People v. Schultz* (2020) 10 Cal.5th 623, 661; *People v. Venegas* (1998) 18 Cal.4th 47, 93.)

---

[30]    Defendant argues the admission of this evidence also violated his federal due process rights, and thus is subject to review under the harmless beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24.  "But the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida*, *supra*, 37 Cal.4th at p. 439.)  Thus, to prove a deprivation of federal due process rights, defendant must satisfy a high constitutional standard.  " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]  'The dispositive issue is … whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." ' " (*People v. Albarran*

**D. The Trial Court Did Not Err in Finding Greene Qualified as an Expert Witness**

Apart from the argument the ShotSpotter technology required a *Kelly* hearing, defendant further contends the trial court erred in concluding that Greene was qualified as an expert to testify about the ShotSpotter technology because "[n]othing in Greene's background showed his expertise in understanding and testifying about these complex [ShotSpotter] systems."

**1. *Applicable Law***

" ' "The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse." ' [Citation.] We find such abuse only where ' " ' "the evidence shows that a witness *clearly lacks* qualification as an expert." ' " ' [Citation.] ' " ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility." ' " ' [Citations.] As with expert qualifications, we review trial court decisions about the admissibility of evidence for abuse of discretion. Specifically, we will not disturb a trial court's admissibility ruling ' "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 97 (*Morales*).)

**2. *Analysis***

Here, Greene testified he worked at ShotSpotter as the manager of forensic services and had been employed with the company for over 14 years. His "current role as the manager of forensic services is primarily … to perform a forensic review of gunshot

---

(2007) 149 Cal.App.4th 214, 229–230.) Defendant has not shown that the admission of the ShotSpotter evidence rendered his trial fundamentally unfair, particularly given that federal law does not require proof that a scientific technique is generally accepted as reliable in the relevant scientific community before such evidence may be admitted. (See *Daubert*, *supra*, 509 U.S. at pp. 588–589.)

incidents that are captured by ShotSpotter." It is also his "responsibility to develop training material and certification material for new experts that [they] hire in the future." He had been qualified as an expert 115 times throughout the United States and is one of two ShotSpotter experts in the entire world. The trial court, in its analysis, found that Greene properly "went through his curriculum vitae" and found that his "experience as it relates to working on networks and so forth, even his training in the military, … the accumulated training and experience with firearms and so forth, does put him above and beyond what a normal citizen and its knowledge would have." "[G]iven [Greene's] relevant on-the-job training and experience, we cannot say [he] ' " ' "clearly lack[ed]" ' " ' the necessary qualifications, such that the trial court abused its discretion in finding him qualified to testify as an expert" regarding the ShotSpotter technology. (*Morales*, *supra*, 10 Cal.5th at p. 99.) Furthermore, Greene's prior expert qualification and expert testimony in 115 separate cases supports the trial court's finding. (See *People v. Williams* (1997) 16 Cal.4th 153, 195 [giving previous expert testimony supports a later qualification as an expert witness].) Accordingly, the trial court did not abuse its discretion in finding that Greene qualified as an expert witness regarding the ShotSpotter technology.

### E. Prejudice

However, even if we found the trial court erred, defendant was not prejudiced by the introduction of the ShotSpotter evidence. The significance of the ShotSpotter evidence was that the Bakersfield Police Department received notifications from ShotSpotter that two gunshots had been fired near the 10th Street and M Street intersection. Officers arrived at the disclosed location and noticed Paul and Jerome lying the roadway. It appears the ShotSpotter evidence was not intended to prove that gunshots had *actually* been fired, but rather to establish that the Bakersfield Police Department *believed* gunshots had been fired and to explain "subsequent action[s] by … law enforcement officer during his [or her] investigation into a murder." (*People v. Samuels*

45.

(2005) 36 Cal.4th 96, 122.)  However, irrespective of the ShotSpotter evidence, the evidence supporting defendant's guilt as to the murders was overwhelming.  First, James, a percipient witness, observed an individual shoot both Paul and Jerome, and described both murders in detail.  Second, officers located blood, two spent nine-millimeter bullet casings near Paul's and Jerome's bodies, and defendant's handprint inside the van.  It was later determined the bullet casings had been fired by defendant's black handgun—a gun that Valerie, his girlfriend, had observed defendant with the day before.  Defendant's cell phone had also been used at the time and place where the murders occurred and defendant himself admitted he was with Paul and Jerome at the time and place of the murders.  Therefore, irrespective of the ShotSpotter evidence, the evidence overwhelming established defendant murdered Paul and Jerome.

III.    **The Trial Court Had No Duty to Conduct a _Marsden_ Hearing and Inquire as to Trial Counsel's Representation of Defendant**

Defendant further contends the trial court prejudicially erred when it:  (1) failed to hold a _Marsden_ hearing and (2) failed to protect his Sixth Amendment right to effective counsel.  We again disagree.

A.    **Additional Factual Background**

Before the defense rested, trial counsel asked for a meeting outside the presence of the jury.  The following relevant exchange is as follows:

> "[TRIAL COUNSEL]:   This is a little unusual and I appreciate the Court indulging me.

> "This morning when we arrived, [defendant] was upset with me for not having introduced certain videos and other pieces of evidence that he thought were critical to his case.  I tried to explain to him the reasons why not.

> "He's upset with me now for not taking him on redirect.  I don't want to invite error by being ineffective in my assistance to him.

> "And before we get to that juncture—first of all, let me preface it with this:  Yesterday during [defendant's] cross-examination, as I was looking at the jury, three of the jurors were laughing during his cross-

46.

examination, number 11, in particular. Two of the others were putting their clipboards to cover their faces to hide the fact that they were laughing.

"At that point I realized that things were just getting worse, not better, and I thought that the lesser time that was spent on his testimony the better, trying to salvage what we could of a bad situation.

"The matters that we talked about this morning were videos that I didn't think were relevant and I had made tactical decisions not to, but inasmuch as we're dealing with a potential life without possibility of parole case, I thought the Court might indulge [defendant] and ask him what it is he wants me to do before I rest.

"I understand it's an unusual request.

"THE COURT:  This is a very extremely unusual request.

"[TRIAL COUNSEL]:  I understand that.

"THE COURT:  [Trial counsel], and [the prosecutor], for that matter, since she is present in court, I think I've said this quite a few times, bordering on *ad nauseam*, and that is, this is not my case. It is your case. You folks are the advocates with your respective sides.

"I can appreciate the tenacity with which you comport yourselves while doing it under the guise according to being officers of the court. I respect both of you folks as highly experienced and trained litigators, having tried cases against one of you and having presided over a number of cases with the other, and I rely on the fact that given your highly accumulated experience in criminal law, as well as the cases that both of you tried, I rely on your trial tactics and strategies and recognize that the discretion of how the case is to be conducted, including the witnesses that might be called, the defenses that might be raised, the evidence that might be presented, is certainly within counsel's purview and discretion.

"Objectively, recognizing that I am a neutral arbiter in this case or a neutral magistrate in this case, there is nothing that has been done on both sides that this Court would be in position to second-guess. Sometimes that circumstance arises and very few times does the Court have to step in, and that stepping in is arbitrarily done and not done at the request of either counsel.

"The question that you have asked, [trial counsel], is something that certainly this Court has experience in requesting by way of a question of the defendant, but it is not in this procedural posture; so that would only come about if we were conducting a separate and confidential hearing.

47.

"[TRIAL COUNSEL]: Would the Court consider conducting a separate and confidential hearing?

"THE COURT: Only if there is a direct request.

"I will say this, [trial counsel]: It appears, given the evidence that has been presented by the People, as well as now the evidence presented by the defense, that you have done what any reasonable and highly trained attorney in your capacity would do with the evidence that's been presented, including the cross-examinations that you have done on the witnesses, raising potential discrepancies in the evidence presented, as well as setting up evidence by way of cross-examination of witnesses to ultimately put your client on the witness stand to show some level of consistency, at least by way of the examination questions that have been asked. And so I do not know what else you could have done in representing [defendant] thus far.

"It is [defendant's] decision to testify. If I were his attorney, I probably would not have had him testify, but it is his decision and his alone to make. It appears he has made it, and at this point you examined him, direct examination, the way one would expect a highly trained, experienced litigator to examine his client.

"[Defendant], for his part, as stated yesterday on the record outside the presence of the jury, had a habit of answering a question initially and then providing a nonresponsive answer subsequently, ultimately to the objection of opposing counsel.

"He appeared to do the same thing this morning. He obviously got out quite a bit of information that was not going toward the call of the question, to no objection or very little objection by the examiner.

"It's not this Court's position to arbitrarily step in and stop it when a witness is answering a question the way [defendant] habitually answered questions during his examination, both direct and cross-examination, unless the examiner asks the Court to intervene. And so consequently, [defendant] was able to present a lot of information to this jury that was not a result of a direct question asked and was not subject to objection by either opposing counsel or the examining counsel for a great fair amount of time.

"With that said, I do not know what else you could have done, [trial counsel], and I do not disagree with the trial tactic and strategy that you have presented.

"[TRIAL COUNSEL]: Very well.

48.

"[DEFENDANT]: Your honor, with all due respect, I apologize if I disrupted the Court during my testimony, and if it pleases the Court, perhaps you can help me get a better understanding of—

"THE COURT: [Defendant], I do not speak directly to you.

"[DEFENDANT]: Do I talk to him about the conflict of interest with [the prosecutor]?

"THE COURT: You can talk to [trial counsel]. He can raise whatever issue he thinks needs to be raised if he deems it necessary.

"[DEFENDANT]: I want to talk about the conflict of interest between she and I. That's why we're being argumentative in front of the jury.

"And I was misled—I was misled about testifying. That's why I testified.

"You told me that I could—you told me I could introduce my—my evidence—

"THE COURT: [Trial counsel], I'm going to treat his comments to you as private comments, directed only to you, so that my reporter does not take it down.

"[DEFENDANT]: Starting now?

"What about the comments I made earlier, your Honor?

"THE COURT: [Trial counsel], do you need a brief recess to confer with your client?

"[TRIAL COUNSEL]: Very brief. [¶] … [¶]

"THE COURT: Is there anything else we need to do at this time?

"[TRIAL COUNSEL]: [Defendant] wants me to put on the record that he would move for a mistrial because it was improper for [the prosecutor] to prosecute this case inasmuch as she prosecuted him in the past and during that case, in his estimation, she committed prosecutorial misconduct, number one.

"Number two, he's asking for a mistrial because he was misled by me into believing that if he were to take the stand that we would be able to present positive character evidence to counteract the implications or the

49.

evidence that are represented in the book that he wrote that [the prosecutor] quoted from. [¶] … [¶]

"THE COURT: The motion by the defendant … involving ineffective assistance of counsel upon [trial counsel] for failing to present character witnesses is denied.

"The Court did express to counsel its view on recognizing that attorneys have the final determination of trial strategies and tactics, and it's apparent that [trial counsel], in his discretion, determined that additional witnesses on behalf of the defense would be fruitless and therefore decided not to present any.

"Tangentially, this has been a discovery issue since June of 2021. When the case was initially assigned to this courtroom, [the prosecutor] did ask for a witness list from the defense. In early July [trial counsel] indicated that there were a number of potential witnesses that might testify in this case all along the lines of character witnesses, but he has to sift through the list of names to determine which ones would be appropriate.

"I did inform counsel at that time that at some point [Evidence Code section] 352 might be triggered as it relates to cumulativeness if character witnesses were to testify. When confronted with approximately 20 names, the Court ruled that perhaps four or five would be reasonable, but the Court would listen attentively to the character witnesses' testimony to determine if it just became cumulative or if it was new or additional information on behalf of the defendant. That issue never materialized, ostensibly because of the discovery requirements and the ultimate determination made by [trial counsel].

"There is nothing, in this Court's view, that would suggest that [trial counsel] has made a decision that a reasonable attorney in his position would not have made. On that basis, I do not see anything ineffective about that determination." (Italics added.)

Subsequently, after the People's closing argument, defendant again raised an ineffective assistance of counsel claim because "he[] [was] dissatisfied with [trial counsel's] performance during the trial, particularly during the defense phase, that [trial counsel] didn't produce enough police reports, videos, or other physical or testimonial evidence … [and] request[ed] a mistrial based on [trial counsel's] ineffective assistance of counsel." The trial court denied the request because the court "placed its opinions regarding ineffective assistance of counsel on the record previously, and it d[id] not

50.

appear to the Court that there has been a changed circumstance that would require the Court to revisit that issue."

On December 7, 2021, prior to sentencing, trial counsel made "a motion to be relieved as [defendant's] counsel on this case" due to a conflict of interest. The trial court then relieved trial counsel of representation and IDP was appointed counsel.

On February 7, 2022, IDP counsel filed a motion for a new trial alleging numerous errors throughout the trial. The trial court denied the motion in its entirety.

### B.    Applicable Law

The law related to *Marsden* motions is well-settled: " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' " (*People v. Fierro* (1991) 1 Cal.4th 173, 204.)

The trial court's duty to hold a *Marsden* hearing "arises when the defendant in some manner moves to discharge his current counsel. The mere fact that there appears to be a difference of opinion between a defendant and his attorney over trial tactics does not place a court under a duty to hold a *Marsden* hearing." (*People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. omitted.) Our Supreme Court has noted that "when a defendant asks for new counsel, a trial court's duty to undertake the *Marsden* inquiry 'arises "*only when the defendant asserts directly or by implication* that his counsel's performance has been so inadequate as to deny him his constitutional right to effective counsel." ' " (*People v. Johnson* (2018) 6 Cal.5th 541, 573.)

51.

### C.    Analysis

Defendant argues the trial court had a *sua sponte* duty to conduct a *Marsden* hearing after his "counsel told the court [he] was dissatisfied with [trial counsel's] advice and performance." However, defendant never " ' "assert[ed] directly or by implication that his counsel's performance ha[d] been so inadequate as to deny him his constitutional right to effective counsel." ' " (*People v. Johnson*, *supra*, 6 Cal.5th at p. 573, italics omitted.) He never filed a *Marsden* motion, nor did he ever indicate he wanted another attorney to represent him. Rather, defendant's comments to trial counsel and the trial court represented simple frustration with trial counsel's legal tactics, and not a desire to obtain different counsel. (*People v. Lucky*, *supra*, 45 Cal.3d at p. 281; see *People v. Richardson* (2009) 171 Cal.App.4th 479, 484–485 [holding there was no duty to conduct a *Marsden* hearing because the defendant's postverdict, presentencing letter to the court complained about "the adequacy of defendant's representation at trial," but did "not mention a desire to obtain substitute counsel"]; see also *People v. Lee* (2002) 95 Cal.App.4th 772, 780 ["[m]ere grumbling" is insufficient].) This conclusion is supported by the fact the next day defendant was asked by the trial court about his feelings toward trial counsel and he replied, "I did speak with [trial counsel] yesterday…. [H]e did explain to me a little bit about it yesterday, his reasoning and stuff, and, I mean, he's been doing this 45 years. So I prayed on it, slept on it, and was, like, I'm going see—this morning I told him I'm gonna see what happens, see where it goes." Defendant's statements effectively constituted a withdrawal of any potential *Marsden* claim. (See generally *People v. Padilla* (1995) 11 Cal.4th 891, 927.) Accordingly, the trial court did not have a duty to conduct a *Marsden* hearing because defendant's statements were not a cumulation of prior complaints against trial counsel and was not made in such a way as to indicate he wanted to discharge his appointed counsel prior to the conclusion of the trial.

Alternatively, defendant argues that "[e]ven if counsel's question was not a request for a *Marsden* hearing," the trial court erred by failing to "relieve counsel to protect [his] Sixth Amendment rights" because his trial counsel "had misadvised him about testifying." As our Supreme Court has made clear:

> "To the extent [a] defendant's claim is based upon an asserted general duty on the part of the trial court to supervise appointed counsel, any obligation that may rest upon the court to uphold a proper standard of representation by appointed counsel [citations] is circumscribed and must be understood in light of the countervailing duty of the court to respect the inviolability of the attorney-client relationship and to permit the defendant to present his or her defense in the manner deemed appropriate by counsel in consultation with the defendant. [Citations.] Thus, the trial court's authority to discharge an appointed attorney for misconduct or incompetence on its own motion is limited." (*People v. Martinez* (2009) 47 Cal.4th 399, 421.)

Here, the trial court concluded that "given the evidence that has been presented by the People, as well as now the evidence presented by the defense, that [trial counsel] ha[s] done what any reasonable and highly trained attorney in [trial counsel's] capacity would do with the evidence that's been presented" and concluded there was nothing else that "could have been done in representing [defendant] thus far." As it related specifically to testifying, the trial court stated, "If I were [defendant's] attorney, I probably would not have had him testify, but it is his decision and his alone to make," but agreed that "[i]t appear[ed] he ha[d] made it, and at this point [trial counsel] examined him, direct examination, the way one would expect a highly trained, experienced litigator to examine his client."

With all that being said, it appears defendant was frustrated because trial counsel decided not to introduce certain pieces of evidence during the trial. However, it is unclear in the record as to whether this evidence was admissible and more importantly, the decision to not admit certain evidence is purely a tactical decision that is given great deference by this court. (*McCoy v. Louisiana* (2018) 138 S.Ct. 1500, 1508 [holding that defense counsel are responsible for tactical trial decisions such as " 'what arguments to

53.

pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence' "]; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 [" '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions' "].)  Accordingly, because "the trial court's authority to discharge an appointed attorney for … incompetence on its own motion is limited" (*People v. Martinez*, *supra*, 47 Cal.4th at p. 421), we cannot say trial counsel's tactical decisions regarding evidence and defendant's testimony constituted incompetence and, thus, the trial court had no duty to discharge trial counsel in this case.[31]

## IV.    <u>Defendant's Constitutional Rights to a Fair Trial Were Not Violated</u>

Defendant further contends his Sixth and Fourteenth Amendment rights to a fair trial were violated when the trial court failed to inquire as to the reasons behind several jurors laughing during his cross-examination.  We again disagree.

### A.    Additional Factual Background

As we discussed in detail in Argument III, *ante*, at the conclusion of the prosecutor's cross-examination of defendant, trial counsel told the trial court he wished to have a meeting with the court outside the presence of the jury.  One of the concerns outlined by trial counsel was he observed "three of the jurors … laughing during [defendant's] cross-examination, … [t]wo of the others were putting their clipboards to cover their faces to hide the fact that they were laughing."  Nothing further was discussed regarding the jurors' behavior.

---

[31]    Because we conclude the trial court did not err by not conducting a *Marsden* hearing nor discharging trial counsel, we need not, and do not, address defendant's argument that the purported errors were prejudicial.

**B.     Applicable Law**

A criminal defendant has the fundamental right to trial by impartial jurors "that consider[] only the evidence admitted in court." (*People v. Stanley* (1995) 10 Cal.4th 764, 836; see U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16.)  A new trial may be granted "[w]hen the jury has … been guilty of any misconduct by which a fair and due consideration of the case has been prevented." (§ 1181, subd. 3.)  However, not every complaint regarding a juror's conduct warrants investigation.  "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his [or her] duties and would justify his [or her] removal from the case." (*People v. Ray* (1996) 13 Cal.4th 313, 343.)  Mere speculation about possible juror misconduct does not justify further inquiry. (*People v. Bell*, *supra*, 7 Cal.5th at p. 120.)

**C.     Analysis**

Defendant contends the trial court deprived him of his Sixth Amendment right to an impartial jury by failing to inquire as to the conduct of the jurors who were laughing during his cross-examination.  Although trial counsel brought up the jurors' behavior to the trial court, he never made any argument alleging prejudicial juror misconduct.  Therefore, "[w]e conclude … that defendant forfeited this issue by failing to seek the juror's excusal or otherwise object to the court's course of action." (*People v. Holloway* (2004) 33 Cal.4th 96, 124.)  " '[H]ad [defendant] made the request at this time … when there was a suggestion of misconduct on the record, the court could have formally ruled on the matter … and cured the problem,' if any, by excusing the juror and substituting an alternate. [Citation.]  Having expressed no desire to have the juror discharged at the time, and indeed no concern the juror had engaged in prejudicial misconduct, defendant 'is not privileged to make that argument now for the first time on appeal.' " (*Ibid.*)  However, as we discuss below, this claim also fails on its merits.

Specifically, as it relates to juror behavior during the trial, our Supreme Court has stated:

> "We agree with the basic premise that a jury's failure to pay attention to the evidence presented at trial is a form of misconduct which will justify the granting of a new trial if shown to be prejudicial to the losing party. [Citation.] The duty to listen carefully during the presentation of evidence at trial is among the most elementary of a juror's obligations. Each juror should attempt to follow the trial proceedings and to evaluate the strengths and weaknesses of the evidence and arguments adduced by each side so that the jury's ultimate determinations of the factual issues presented to it may be based on the strongest foundation possible. Were the rule otherwise, litigants could be deprived of the complete, thoughtful consideration of the merits of their cases to which they are constitutionally entitled." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 411 (*Hasson*).)

In *Hasson*, affidavits stated that some jurors had been reading novels and doing crossword puzzles during the evidentiary portion of the case. (*Hasson*, *supra*, 32 Cal.3d at p. 410.) *Hasson* identified several factors a court should consider in deciding whether the presumption of prejudice has been rebutted: "the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Id*. at p. 417.) The court concluded the jurors had engaged in "essentially neutral, albeit distracting, activities at unspecified times during the presentation of evidence," but that the misconduct was not " 'of such a character as is likely to have influenced the verdict improperly.' " (*Id*. at pp. 417–418.)

Here, the only evidence in the record demonstrating *any* potential juror misconduct is a brief statement made by trial counsel during the course of a lengthy, unrelated argument. Other than this one statement, trial counsel never again raised the issue. Further, after IDP counsel took over the case, he filed a motion for a new trial alleging a multitude of issues, but never once mentioned any juror misconduct in his moving papers or during argument. Trial counsel's one brief statement does not "constitute 'good cause' to doubt [the] juror[s'] ability to perform his [or her] duties [that] would justify [their] removal from the case." (*People v. Ray*, *supra*, 13 Cal.4th at

56.

p. 343.) Therefore, no hearing was required. However, even if we concluded a presumption of prejudice existed, "the strength of the evidence that misconduct occurred … and the probability that actual prejudice may have ensued" is lacking. (*Hasson*, *supra*, 32 Cal.3d at p. 417.)

## V. The Trial Court Did Not Err By Allowing the Prosecutor to Impeach Defendant With His Self-Published Book

Finally, defendant contends the trial court erred by permitting the prosecutor to impeach him with portions of his self-published book, *Loc Tales: The True Story of a California Gangsta*. We again disagree.

### A. Additional Factual Background

In her motion in limine, the prosecutor moved to "impeach [] defendant with several portions of his self-authored book, '*Loc Tales: The True Story of a California Gangsta*.' " Specifically, she argued the following conduct mentioned in the book involved moral turpitude and should be allowed for impeachment: (1) attempted murder (including robbery and domestic violence); (2) drug sales; (3) active participation in a criminal street gang; (4) manufacturing weapons in prison; and (5) assault on an inmate in prison. The trial court, the prosecutor, and trial counsel had the following relevant lengthy exchange regarding this evidence:

"THE COURT: [Prosecutor], do you have any comments regarding excerpts from the book *Loc Tales: The True Story of a California Gangsta*?

"This begins on page 16, line five, through page 20, line 21.

"[PROSECUTOR]: Just, Judge, for foundation, I think I can easily establish it. He has author Eric Nichols, published by Eric Nichols Publishing, several—I don't know, about 20 pictures of him in the middle of himself in and out of prison.

"He also wrote my boss … a letter from jail last fall where he encourages her to purchase and read his book.

"So I think that certainly foundation-wise we're there. [¶] … [¶]

"THE COURT: Thank you.

57.

"[Trial counsel], do you have any response?

"[TRIAL COUNSEL]: Yeah. There's no quarrel about foundation. Everything that [the prosecutor] says is accurate. I have no quarrel with that.

"It was—I believe our discussion a month ago was my perspective is he wrote it—and she's right, he's proud of the publication. He wrote it. He has to live with it. [¶] … [¶] … According to [defendant], the book isn't 100-percent factually true.

"To be honest, having read the book, I think there's a lot of puffing in the book, but the problem is that if he said it, it's going to be incumbent on him to refute it if he's challenged on it.

"And without beating around the bush, I mean, if there are homicides that are alluded to in that book and he's subject to prosecution on those homicides because there's no statute of limitations, then I think he probably has Fifth Amendment protections from questioning about those homicides. I can't think of anything else in there that's not barred by the statute of limitations.

"But that was the one source of concern for me. If he takes the witness stand, there's no question that he said it, he's going to have to own it, and if part of it's fanciful and part of it's factual, he'd have to explain that to the jury and explain to them why part of it's true and the part that stings the most is not true, which I think would be a difficult portion of his testimony.

"But that's my only legitimate concern is—with the rest of the book, he's stuck with it if he testifies. [¶] … [¶]

"[THE COURT:] [Prosecutor], one final area of inquiry involving excerpts from the book.

"The excerpts that you included in your motion, is it your opinion that these are actual events that occurred or are they fantastical and grandiose in nature?

"[PROSECUTOR]: I think they're factual descriptions of what occurred, your Honor.

"THE COURT: And does the book outline any particular dates from when these incidents occurred, [prosecutor]?

58.

"[PROSECUTOR]:   No, Judge, just in the prologue, [defendant] does say, 'I couldn't share everything because some things have no statute of limitations.'  So despite knowing that, he still decided to write and publish this.

"He begins the book by talking about growing up on the west side and talking about crimes from the '80s, but there's no other description on dates, probably because he knows there's no statute of limitations on things like murder, and he wrote this, though, in 2016 when he was incarcerated for his [Vehicle Code section] 2800, and towards the end of the book it seems as if he is talking about things that happened during his incarceration; so I can only gather that the earlier parts of the book were years before.

"THE COURT:   [Prosecutor], regarding the excerpts that you have requested permission to introduce for credibility purposes, in your opinion, do any of those excerpts that describe moral turpitude conduct, such as assaults on an inmate in prison, drug sales, manufacturing weapons in prison, do any of those possess a statute of limitations issue?

"[PROSECUTOR]:   Well, Judge, I don't believe he would have the right to take the Fifth, if he testifies, on anything.  You either testify and are available for all questions or you can't.  I don't think you can pick and choose as to when you take the Fifth Amendment.

"THE COURT:   So do they not have a Fifth Amendment issue—I mean, a statute of limitations issue, in your mind?

"[PROSECUTOR]:   I think depending—I think depending on when they were, they potentially could, but, I mean, I think it would be fair to say he wrote the book in 2016 and those are typically, what, three to five years for statute of limitations; so I think they're out of that realm given they happened before his incarceration in 2016.  [¶] … [¶]

"THE COURT:   As to the book entitled *Loc Tales: The True Story of a California Gangsta*, in considering the passages that have been requested by the People, the Court has thought about the impact this information might have on an individual's credibility, at least from a juror's perspective, and how they would treat it as impeachment material.

"This information would be introduced not for the truth of the matter asserted, but rather as information to discern, with reasonable inference, a witness's ability to be honest and truthful or inability to be honest and truthful; so for those credibility purposes, the Court has considered the particular passages that have been requested from the book.

59.

"Firstly, foundation is always necessary, and the Court does accept the representations by counsel that foundation would be provided through the book itself, including the name of the author on the book, in addition to the photographs contained within the book, to authenticate that it was, in fact, the defendant who wrote the contents within that book.

"Under [section] 1220 of the Evidence Code, it does allow an opposing party to introduce the defendant's statements. It is usually categorized as party admissions and so forth, but it is statements of the defendant or of the opposing party.

"For foundational purposes, assuming that it can be properly laid that the defendant is the individual who wrote that book, then there would be a viable hearsay exception for purposes of its introduction.

"Based on the representations previously, the introduction of such excerpts from the book, if not the book itself, are being introduced for the sole purpose of testing the defendant's veracity or credibility if he chooses to testify.

"Since both counsel understand that the statute of limitations very well might be an issue as to some of these excerpts, if not all of them, and, for the most part, both counsel are accepting what has been written in the book as factual and not necessarily fantastical, although there may be some grandiosity and so forth contained within the book, the Court is considering it with those thoughts in mind only as it relates to the eventual examination of the defendant.

"Attempted murder is one of those crimes that does not have a statute of limitations, just like murder, and on that basis this Court believes that the defendant would have a Fifth Amendment right not to answer any questions along that issue.

"The other excerpts that are being requested to be introduced by the prosecution include drug sales, active participation in a criminal street gang, manufacturing weapons in prison, as well as assault on an inmate in prison. Given what's been presented during the course of this evidentiary hearing, it is apparent to this Court that at least a reasonable inference can be drawn that the statute of limitations would not apply to those circumstances, which is important when determining what questions, if any, could be asked of the defendant.

"Firstly, for credibility purposes, the Court does find that the excerpts that are being requested by the People do fall under the category contained in Evidence Code Section 780, which deals directly with the credibility of witnesses testifying, and on that basis the excerpts are

60.

relevant to test the defendant's credibility, assuming the foundation as previously described is satisfied.

"In considering all of the areas that the People seek to introduce while going over the book and trying to limit themselves to particular subject matter, the Court is going to exercise its discretion and find under [Evidence Code section] 352 that the following areas are relevant, that their probative value certainly outweighs any prejudicial effect, and therefore are admissible.

"The People can introduce the attempted murder passages found on page—beginning on page 16, under the heading Attempted Murder, including robbery and domestic violence. Page 18, the passage involving drug sales. Page 19, the passages involving manufacturing weapons in prison. And on page 20, the passage under assault on an inmate in prison. Under [Evidence Code section] 352 the Court is going to allow the introduction of this material for credibility purposes.

"In its discretion, however, the Court is going to exclude any reference to active participation in a criminal street gang, specifically page 163.

"The Court, however, is not going to exclude reference to the back cover as it might be necessary for foundational purposes.

"The admissibility of these portions certainly can be done on cross-examination or even direct examination of the defendant while he is testifying.

"The Court is going to preclude any questions asked of the defendant involving, however, the attempted murder, including robbery and domestic violence, for the Fifth Amendment reasons that the Court has stated previously.

"Counsel can certainly question the defendant about the drug sales, the manufacturing weapons in prison, the assault on an inmate in prison, but not the attempted murder. I will not order that the defendant answer questions involving the attempted murder, if he invokes a Fifth Amendment right, because of the statute of limitations still being applicable, which leads to the Court's inquiry.

"[Prosecutor], I know that you are an experienced litigator and you certainly know how to examine witnesses, both direct and cross-examination. The Court is giving you permission to lay the proper foundation for these excerpts or for the book in its entirety, and I'm confident, if the defendant testifies, that is something you are going to do.

61.

"I'm also going to allow you to question the defendant, if he testifies, on those areas other than the attempted murder." (Italics added.)

Later on, trial counsel asked for clarification that the trial court's limitation only applied to the prosecutor and "if the defense chooses to ask [defendant] questions about the attempted murders and he answers them, then essentially that limitation that I have placed on [the prosecutor] would at that point be lifted." Subsequently, defendant testified and the prosecutor impeached him with the above referenced portions from his book.

**B.      Defendant was Properly Impeached with Portions from his Book**

First, defendant argues the trial court erred when it allowed the prosecutor to impeach defendant with portions from his book because the "events described in the book were not admissible for impeachment" (unnecessary capitalization omitted) and that the "material should have been excluded under [Evidence Code] section 352" (unnecessary capitalization omitted).

**1.      *Applicable Law***

A witness may be impeached with prior convictions involving "moral turpitude," subject to the trial court's exercise of discretion under Evidence Code section 352 to exclude evidence of prior convictions if the prejudicial impact of the evidence does not outweigh its probative value. (*People v. Clark* (2011) 52 Cal.4th 856, 931–933; *People v. Castro* (1985) 38 Cal.3d 301, 306.) Moral turpitude is defined as a " 'general readiness to evil,' " from which a readiness to lie can be inferred. (*Castro*, at p. 315.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the

defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

In exercising its discretion under Evidence Code section 352 when determining whether to admit a prior conviction for impeachment purposes, the trial court should consider " '(1) whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear of being prejudiced because of impeachment by prior convictions.' " (*People v. Green* (1995) 34 Cal.App.4th 165, 182, quoting *People v. Muldrow* (1988) 202 Cal.App.3d 636, 644.) The trial court's discretion to admit or exclude impeachment evidence is broad, and a reviewing court ordinarily will uphold the trial court's exercise of that discretion. (*People v. Collins* (1986) 42 Cal.3d 378, 389.) We will not disturb the trial court's ruling absent a showing the court " ' "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Morales*, *supra*, 10 Cal.5th at p. 97.)

### 2. *Analysis*

Here, defendant argues he was improperly impeached with portions of his book because much of his writing "was puffing" and that "the prosecutor made no attempt to show the events she sought to use for impeachment were true and therefore met the basic relevance requirement." However, the prosecutor told the trial court, she believed the book involved "factual descriptions of what occurred," and trial counsel himself conceded that "there's no question that he said it, he's going to have to own it, and if part of it's fanciful and part of it's factual, he'd have to explain that to the jury and explain to them why part of it's true and the part that stings the most is not true." Further, defendant corroborated the book's accuracy when he testified he made knives in prison, and that he

"unloaded [a] 30-round clip into [a] truck," both of which were mentioned in the book. With all that being said, defendant argues because "[t]here was no showing, however, that the most lurid of the sections, about stabbing a man in the face and brutalizing a former girlfriend were true," it was admissible for impeachment. First, the fact defendant, himself, admitted the accuracy of portions of his *own* book established a likelihood the other portions of the book were true as well. (See *People v. Bowley* (1963) 59 Cal.2d 855, 858–859 [holding that although the victim "authenticated only portions of the film," this was a "legally sufficient foundation for its admission into evidence"].) Second, all the crimes listed by the prosecutor in her motions in limine were arguably crimes involving moral turpitude, and it appears in the record that trial counsel himself conceded the fact the crimes mentioned in the prosecutor's motion were all crimes involving moral turpitude. The record indicates the trial court properly weighed defendant's prior offenses and, thus, the trial court's ruling was not arbitrary, and defendant points to nothing in the record to suggest a manifest injustice arose from its decision. (*Morales*, *supra*, 10 Cal.5th at p. 97.)

Defendant further argues the evidence should have been excluded under Evidence Code section 352 because "the conduct was more prejudicial than probative." We find *People v. Ortiz* (2003) 109 Cal.App.4th 104 (*Ortiz*) instructive. The *Ortiz* court noted minimal potential for prejudice existed because evidence of the prior Evidence Code section 1101, subdivision (b) prior acts were " 'no stronger and no more inflammatory than the testimony concerning the charged offenses.' " (*Id*. at p. 118.) Moreover, the court concluded the trial court properly conducted an Evidence Code section 352 analysis because it "neither granted nor rejected admission of the proffered evidence in toto," but "[i]nstead, [the trial court] ruled some of the People's evidence admissible and some inadmissible." (*Ortiz*, at p. 117.) Finally, the trial court instructed the jury it could only consider evidence of this prior misconduct for the limited purpose of evaluating the defendant's intent. (*Id*. at p. 118.)

Here, the trial court conducted an Evidence Code section 352 analysis and admitted the impeachment evidence because "the excerpts that [were] being requested by the People do fall under the category contained in Evidence Code [s]ection 780, which deals directly with the credibility of witnesses testifying, and on that basis the excerpts are relevant to test the defendant's credibility, assuming the foundation as previously described is satisfied." With that being said, the trial court "neither granted nor rejected admission of the proffered evidence in toto" (*Ortiz*, *supra*, 109 Cal.App.4th at p. 117), because it "preclude[d] any questions asked of the defendant involving, however, the attempted murder, including robbery and domestic violence" and "exclude[d] any reference to [his] active participation in a criminal street gang." The likelihood of prejudice was low because the underlying facts of this case involved a double murder; whereas, the prior incidents involved far less serious crimes. (See *id*. at p. 118.) Further, the trial court instructed the jury that "certain evidence was admitted for a limited purpose" and that "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." Therefore, the trial court did not abuse its discretion because it properly conducted an Evidence Code section 352 analysis.

### C.     The Applicability of Evidence Code Section 352.2

Second, defendant contends that newly enacted Evidence Code section 352.2 applies retroactively to this case and that the use of portions of his book against him "can be prejudicial because of the impact on the jury's evaluation of the case … [and] the injection of racial bias into the case."

#### 1.     *Applicable Law*

Effective January 1, 2023, newly enacted Evidence Code section 352.2 creates specific rules that the trial court must follow in deciding whether to admit evidence of "a form of creative expression" in a criminal trial. Evidence Code section 352.2 states in full:

"(a)  In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under [Evidence Code] [s]ection 352, shall consider, in addition to the factors listed in [s]ection 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code] [s]ection 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings.

"(b)  If proffered and relevant to the issues in this case, the court shall consider the following as well as any additional relevant evidence offered by either party:

"(1)  Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression.

"(2)  Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings.

"(3)  Evidence to rebut such research or testimony.

"(c)  For purposes of this section, 'creative expression' means the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media.

"(d)  The question of the admissibility of a form of creative expression shall be heard in limine and determined by the court, outside the presence and hearing of the jury, pursuant to [Evidence Code] Section 402. The court shall state on the record its ruling and its reasons therefor." (Evid. Code, § 352.2.)

As *People v. Ramos* (2023) 90 Cal.App.5th 578 (*Ramos*) stated, "In enacting the

provision, the Legislature made the following findings and declarations, showing that a

66.

particular concern was the possible unfair prejudice stemming from the admission of rap lyrics:

> '(a) Existing precedent allows artists' creative expression to be admitted as evidence in criminal proceedings without a sufficiently robust inquiry into whether such evidence introduces bias or prejudice into the proceedings. In particular, a substantial body of research shows a significant risk of unfair prejudice when rap lyrics are introduced into evidence. [Citations.]

> '(b) It is the intent of this Legislature to provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice.' (Stats. 2022, ch. 973, § 1.)" (*Ramos*, *supra*, 90 Cal.App.5th at pp. 591–592.)

As of today, the Courts of Appeal are split as to whether Evidence Code section 352.2 applies retroactively. (*Ramos*, *supra*, 90 Cal.App.5th at p. 596 [Evid. Code, § 352.2 *does not* apply retroactively]; *People v. Venable* (2023) 88 Cal.App.5th 445, 448 [Evid. Code, § 352.2 *does* apply retroactively].) Even assuming Evidence Code section 352.2 does apply retroactively, reversal is not required because any error in admitting portions of defendant's book was harmless under any standard of review.

### 2.     *Analysis*

Here, the prosecutor's reference to portions of defendant's book were relatively unimportant as it related to the entirety of the People's case. (Cf. *People v. Venable*, *supra*, 88 Cal.App.5th at pp. 455–458 [rap video implicating the defendant in charged offenses was reversible error because it was central to the prosecution's case].) Additionally, in assessing possible prejudice, it is also significant the references to the book were not used to establish defendant's propensity to commit criminal acts or to prove he was guilty of the underlying charges, but rather to simply impeach him with prior crimes involving moral turpitude. Although defendant fears that references to the

book created the potential for racial stereotyping that Evidence Code section 352.2 is intended to guard against, the jury was instructed not to let the issue of race influence its decision-making process (CALCRIM No. 200) and there is nothing in the record to rebut the presumption the jury understood and followed this admonition.  (See generally *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [a foundational presumption underlying our constitutional system of trial by jury is that jurors are capable of understanding and applying all the instructions they are given].)

## DISPOSITION

The judgment is affirmed.


                                                                    DE SANTOS, J.

WE CONCUR:


HILL, P. J.


SMITH, J.